**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| COURTNEY GREEN, | : | No. 3:24-cv-01317 (VDO) |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| COMMISSIONER QUIROS, et al., | : | JUNE 12, 2025 |
| *Defendants.* | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The undersigned defendants move for summary judgment. Fed. R. Civ. P. 56; D. Conn. L. Civ. R. 56; *see also* 28 U.S.C. § 1915(e)(B). There are no genuine disputes of material fact as to the arguments presented herein, and the defendants are entitled to judgment as a matter of law. The defendants did not violate Plaintiff's Fourth Amendment rights. Any strip searches of the Plaintiff were conducted in a professional manner and for a legitimate penological purpose—to reduce the risk of contraband being introduced into a correctional facility. In addition, the defendants are entitled to qualified immunity because their actions were reasonable under the circumstances and did not violate any clearly established law. Additionally, defendant Quiros had no personal involvement, which provides an additional basis to grant him qualified immunity. Finally, as to defendant Coggeshall, there are no genuine disputes of material fact as to the Defendants' Affirmative Defense from their Answer, which asserts that Plaintiff failed to properly exhaust his administrative remedies before filing this action as he was required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (Doc. 28, "Third Affirmative Defense").

## I.   BACKGROUND AND PROCEDURAL HISTORY

### A.   Background.

Plaintiff is a *pro se* inmate incarcerated within the Connecticut Department of Correction ("DOC"). (Defs. Local Rule 56(a)(1) St., at ¶ 1). Plaintiff brings this action under 42 U.S.C. § 1983. (Doc. 1 p. 1). Plaintiff filed the action from prison while he was incarcerated within the Carl Robinson Correctional Institution ("Robinson CI"). *See* (Doc. 1). Plaintiff initially brought suit against DOC Commissioner Angel Quiros; Robinson CI Warden Zelynette Caron; Robinson CI Deputy Warden Lenny Ogando; and Correctional Officers Richard Starzyk and Herbert Coggeshall in their *official capacities* seeking injunctive relief and in their *individual capacities* for money damages. (Doc. 1, Pg. 2 – 3).

Following its initial review, the Court allowed Plaintiff to proceed on his Fourth Amendment challenge to the strip search policy against Commissioner Quiros, Warden Caron, and Deputy Warden Ogando, and to proceed on a Fourth Amendment claim alleging unreasonable searches conducted by Correction Officers Starzyk and Coggeshall. (Doc. 11, Pg. 7 – 10, 11). These claims were allowed to proceed against defendants in their individual capacities for money damages and in their official capacities to remedy an alleged ongoing Fourth Amendment violation. (Doc. 11, Pg. 7 – 10, 11). Plaintiff was also initially allowed to proceed on a state law claim under Article First, Section 7 of the Connecticut Constitution against the defendants in their individual capacities. (Doc. 11, Pg. 11). Plaintiff's Fourteenth Amendment claims were dismissed. (Doc. 11, Pg. 10).

On January 21, 2025, the defendants moved to dismiss Plaintiff's *official capacity* Fourth Amendment injunctive relief claims as moot and Plaintiff's *individual capacity* state law claim under Article First, Section 7 of the Connecticut Constitution because that section of the Connecticut Constitution does not provide for a private cause of action under the circumstances of this case. On March 7, 2025, the Court granted the defendants' partial motion to dismiss. (Doc. 27). <u>As a result, Plaintiff's only remaining claim concerns his Fourth Amendment allegations against the defendants in their *individual capacities* for money damages.</u>

Plaintiff alleges that on or about June 3, 2024, he had a video visit with an approved visitor in the facility's visiting room. (Doc. 1 at ¶ 21). Plaintiff states that, prior to entering the visiting room, he was pat searched with negative findings for contraband, and then allowed to enter the visiting room. *Id.* Plaintiff indicates that, after entering the visiting room, he conducted his video visit without issue. *Id.* At the end of the allotted visiting time, Plaintiff states that he was instructed by defendant Starzyk to exit the visiting area and line up at the door of the holding area. *Id.* at ¶ 22. Plaintiff asserts that after leaving the visiting area he was instructed by defendant Starzyk to remove his clothing and submit to a visual cavity search, to which Plaintiff eventually complied without incident, after stating a verbal objection to the procedure on policy grounds. *Id.* at ¶¶ 27-29.

According to Plaintiff, on or about June 10, 2024, he attended another video visit at Robinson CI and was again pat searched before entering the visiting room with negative findings for contraband. *Id.* at ¶ 33. Similar to the previous incident,

3

according to Plaintiff, at the end of his visit he was instructed to exit the visiting area by a non-party and subsequently had a visual cavity search, this time by defendant Coggeshall. *Id.* at ¶¶ 34-37.

Defendants do not deny that strip searches were conducted following video visits at Robinson CI, however, **Plaintiff neglects to mention that all visits at Robinson CI are conducted in the same visiting room, and that both contact and video visits can occur simultaneously**. Therefore, because video visits occur in a public visiting area, potentially with members of the public who are conducting separate visits or who have been present there in the past, strip searches are penologically necessary and constitutionally appropriate to prevent the introduction of contraband into the facility.

### B.    Facts Concerning Administrative Remedies.

Generally, Connecticut inmates who wish to exhaust their administrative remedies and bring matters to the attention of the DOC do so by following the process set forth in the DOC's Administrative Directive 9.6 § 5 and § 6 *et seq. See* (A.D. 9.6 p. 2 – 6 § 5; p. 6 – 8 § 6 *et seq.*)(eff. 4-30-2021)(Att. 1 to Ex. H). The requirements of A.D. 9.6 § 6 have been detailed repeatedly across a large swath of Court decisions throughout this District. *See, e.g., Baldwin v. Arnone,* Civil Action No. 3:12-cv-243 (JCH), 2013 U.S. Dist. LEXIS 22520, at \*16–\*20 (D. Conn. Feb. 15, 2013); *Sanders v. Viseau*, No. 3:20CV00250, 2021 U.S. Dist. LEXIS 247916, at \*8-\*9 (D. Conn. Dec. 30, 2021) (collecting cases); *Correa v. McLeod*, No. 3:17-cv-1059 (VLB), 2018 U.S. Dist. LEXIS 242249, at \*7-\*10 (D. Conn. June 4, 2018); *Shehan v. Erfe,* CASE NO. 3:15-cv-

1315 (MPS)*, 2017 U.S. Dist. LEXIS 1116, at *13-*22 (D. Conn. Jan. 4, 2017); *see also Riles v. Buchanan*, 656 F. App'x 577, 579–82 (2d Cir. Sept. 1, 2016) (summary order).

The process requires an aggrieved inmate to first seek informal resolution of his issues, in writing, through the use of an Inmate Request Form prior to filing a formal grievance, with a response to be made within 15 days. (A.D. 9.6, Pg. 6 § 6(a)(i)). If the inmate is not satisfied with the informal resolution offered, the inmate must file a grievance and attach the Inmate Request Form containing the appropriate staff member's response, among other requirements. (*Id.* at Pg. 6 § 6(a)(ii)). This filing must be submitted within 30 days of the cause of the grievance. (*Id.* at Pg. 7 § 6(a)(ii)(4)) ("Any CN 9602, Inmate Grievance Form- Level 1, *must* be filed within 30 calendar days of the occurrence or discovery of the cause of the Grievance.") (emphasis added); *see also Riles*, 656 F. App'x at 579. From there, an inmate can appeal the decision of the Level-1 Grievance by filing a Level-2 Appeal within either (1) 5 calendar days of the receipt of the decision of the Level-1 Grievance, or (2) within 65 days of the date of the filing of the Level-1 Grievance if the inmate does not receive a timely response to the Level-1 Grievance. (Defs. Local Rule 56(a)(1) St., at ¶ 36).

In this case, there can be no dispute of fact that Plaintiff filed a single grievance following the June searches at issue. (Defs. Local Rule 56(a)(1) St., at ¶ 40). Moreover, this grievance only describes two searches by defendant Starzyk, while making no mention of Officer Coggeshall whatsoever. (*Id.* at ¶41 – 42).

### C. Short Synopsis of Arguments Presented Herein.

For the foregoing reasons, and as discussed further below, the defendants now move for summary judgment. First, Plaintiff cannot establish a Fourth Amendment violation, because the strip searches in question were conducted in a professional manner and for a legitimate penological interest. (*Id.* at ¶¶32 & 17). Second, it follows that the defendants are entitled to qualified immunity in connection with those searches. Third, as for defendant Quiros, he is separately entitled to qualified immunity for a lack of personal involvement with respect to the searches in question. Fourth and finally, Plaintiff's failure to properly exhaust his available DOC administrative remedies, as required by the PLRA, bars any claims against defendant Coggeshall. (*Id.* at ¶44).

## II.    ARGUMENT

### A.    Legal Standards, Motion for Summary Judgment.

Federal Rule of Civil Procedure 56 requires the entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[T]he mere existence of a factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no genuine issue of material fact." *Id.* at 247-48. A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Further,

a "material fact" is one whose resolution will affect the ultimate determination of the case. *Id.* In determining whether a material fact exists, the court must resolve all ambiguities in favor of the non-moving party. *Id.* at 255; *see also J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990), *cert. denied*, 499 U.S. 921 (1991).

> The Supreme Court confirms:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules, as a whole, which is designed to secure the just, speedy and inexpensive determination of every action.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Used properly, Rule 56 is a "vital procedural tool to avoid wasteful trials." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 541 (2d Cir.), *cert. denied*, 510 U.S. 497 (1993). It is properly used to "isolate and dispose of factually unsupported claims." *Celotex Corp.*, 477 U.S. at 323-24.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Those facts that are material will be identified by the substantive law governing the case. *Anderson*, 477 U.S. at 248. Once the moving party meets its initial burden, the burden to produce evidence tending to establish a disputed issue of material fact then shifts to the non-moving party. *See Gutwein v. Roche Laboratories, Div. of Hoffman-La Roche, Inc.*, 739 F.2d 93, 95 (2d Cir. 1984).

To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in the complaint, nor rely on "mere speculation or conjecture." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986), *cert. denied*, 480 U.S. 932 (1987). The evidence must be presented in a manner consistent with its admissibility at trial. *See First Nat'l Bank Co. v. Ins. Co. of N. Am.*, 606 F.2d 760, 766 (7th Cir. 1979) (in ruling on summary judgment motion, courts properly rely upon documents and exhibits identified by affidavit). Unsworn statements of the parties, letters addressed to the litigants from third persons, and hearsay not within the one or more exceptions in Rules 803–805 of the Federal Rules of Evidence, may not be properly considered on summary judgment. *See, e.g.,* Fed. R. Civ. P. 56 (c) (parties "must support" assertions of genuine disputes of material fact by "citing to . . . depositions, . . . affidavits or declarations, [etc.] . . .;" not listing unsworn statements); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17 (1970) (noting that unsworn statement "does not meet the requirements of Fed. Rule Civ. Proc. 56"); *United States v. 143-147 E. 23rd St.*, 77 F.3d 648, (2d Cir. 1996) ("The submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court."); *Barlow v. Connecticut*, No. 3:00-CV-1983 (EBB), 2004 U.S. Dist. 9237, at *1 (D. Conn. May 4, 2004) ("Unsworn statements, letters addressed to litigants, and affidavits composed of hearsay and non-expert opinion evidence do not satisfy Rule 56(e) and must be disregarded."); *see also Beyene v. Coleman Sec.*

*Servs., Inc.*, 854 F.2d 1179, 1180-83 (9th Cir. 1988); *Edward B. Marks Music Corp. v. Stasny Music Corp.*, 1 F.R.D. 720, 721-22 (S.D.N.Y. 1941).

Moreover, the Plaintiff must point to and support with admissible evidence "each issue of material fact as to which it is contended there is a genuine issue to be tried." Local R. 56(a) *et seq.*; *see also Anderson*, 477 U.S. at 248. Moreover, the Plaintiff must produce evidence to show the existence of every element essential to the case which he bears the burden of proving at trial. *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

**B.    Plaintiff Cannot Establish a Fourth Amendment Violation.**

"[I]nmates retain a limited right to bodily privacy under the Fourth Amendment." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "Courts assessing an inmate's claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the inmate has 'exhibit[ed] an actual, subjective expectation of bodily privacy'; and (2) second, the court must determine 'whether the prison officials had sufficient justification to intrude on [the inmate's] fourth amendment rights.'" *Id.* (quoting *Covino v. Patrissi*, 967 F.2d 73, 77-78 (2d Cir. 1992)). Here, Plaintiff asserts a Fourth Amendment challenge to the strip search policy against defendants Quiros, Caron, and Ogando, and separately a Fourth Amendment violation arising from individual unreasonable searches conducted by defendants Starzyk and Coggeshall. (Doc. 10, Pg. 7).

As to the first prong, Plaintiff alleges he was subjected to a visual cavity search by defendant Starzyk following a video visit on June 3, 2024. (Doc. 1, ¶ 29). Plaintiff alleges a similar visual cavity search by defendant Coggeshall on June 10, 2024. (Doc.

1, ¶ 36). Courts in this Circuit have held that "a visual body cavity search is a 'serious invasion of privacy.'" *Velez-Shade v. Population Management*, No. 3:18cv1784(JCH), 2019 U.S. Dist. LEXIS 163779, at *23 (D. Conn. Sept. 25, 2019) (citing *Harris*, 818 F.3d at 58). Next, the Court must "determine[e] the validity of a prison regulation claimed to infringe on an inmate's constitutional rights" by "ask[ing] whether the regulation is reasonably related to [a] legitimate penological interest[]." *Covino*, 967 F.2d at 78 (citing *Washington v. Harper*, 494 U.S. 210, 223-24 (1990)).

Turning to the second prong, "courts apply one of two separate but overlapping frameworks." *Harris*, 818 F.3d at 57. "If the inmate's Fourth Amendment claim challenges a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley*, 482 U.S. 78, [ ] (1987)." *Id.* at 57. "Under *Turner*, 'the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* at 57-58. Alternatively, "if the inmate's Fourth Amendment claim challenges an isolated search, courts typically apply the standard set forth in *Bell v. Wolfish*, 441 U.S. 520 [ ] (1979)." *Id.*

As discussed in detail below, <u>regardless of the test applied, the searches in question were easily justified by the legitimate penological interest of keeping contraband out of a correctional facility</u>. It follows that if searches after contact visits are justified, then searches after video visits, that co-occur with contact visits, would also be constitutionally appropriate.

### a. Plaintiff's Challenge to the DOC Strip Search Policy Fails as a Matter of Law.

10

The *Turner* Court listed the following four factors "governing the review of prison regulations:"

> (i)    whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> (ii)   whether there are alternative means of exercising the right in question that remain open to prison inmates;
>
> (iii)  whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and
>
> (iv)   whether there are reasonable alternatives available to the prison authorities.

*Covino*, 967 F.2d at 78-79 (citing *Turner v. Safley*, 482 U.S. 78, 89-90 (1987)) (spaced factors for readability).

"Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 322 (2012). Courts in this Circuit have thus recognized that there is "a valid, rational connection between [a correctional institution's] post-classification strip search policy and the legitimate governmental interest of preventing contraband distribution within the [correctional institution]." *Sassi v. Dutchess Cnty.*, No. 9:16-cv-1450, 2019 U.S. Dist. LEXIS 15387, 2019 WL 401951, at *14 (N.D.N.Y. Jan. 23, 2019). This is so because a newly arriving inmate can secrete contraband into his body and distribute it to other inmates once inside the facility. *See id.; see also Shain v. Ellison*, 273 F.3d 56, 64 (2d Cir. 2001) (noting that "contraband often is passed" during contact visits in prisons);

11

*Barnes v. Fedele*, No. 07-CV-6197L, 2021 U.S. Dist. LEXIS 243496, at *10 (W.D.N.Y. Dec. 21, 2021) ("[B]y any measure, reducing the risk of smuggled-in contraband is a legitimate penological objective.") (internal quotation marks omitted) (citing *Bell*, 441 U.S. at 559 (1979)); Conn. Gen. Stat. § 53a-174 (a) (class D felony to convey into a correctional facility inter alia "any controlled drug, as defined in section 21a-240 [which include but are not limited to 'those drugs which contain any quantity of a substance which has been designated as subject to the federal Controlled Substances Act'] . . ."); Conn. Gen. Stat. § 53a-174 (b) (class A misdemeanor crime to convey in into a Connecticut prison any unauthorized "letter or other missive which is intended for any person confined therein . . . .").

Plaintiff asserts that he was strip searched following video visits at Robinson CI. (Doc. 1, ¶¶29, 36). However, Plaintiff neglects to mention that all visits at Robinson CI are conducted in the same physical space, (Defs. Local Rule 56(a)(1) St., at ¶6.), and it is undisputed that the visiting room at Robinson CI is the only appropriate location at that facility that can accommodate social visits. (*Id*. at ¶8.) It is also undisputed that strip searches of inmates returning from the Robinson CI visiting room have resulted in the discovery of contraband. (*Id*. at ¶19.) Additionally, hidden contraband has been located within the visiting room, presumably left with the intention that inmates would eventually retrieve it. (*Id*. at ¶20). Therefore, although inmates participating in video visits do not have contact with their visitors, a strong possibility exists that they can obtain contraband either directly from outside visitors or through a separate inmate conducting a contact visit, as an intermediary.

Applying the *Turner* framework, Robinson CI has a valid, legitimate penological interest in conducting strip searches following video visits where contact and video visits are conducted in the same physical space simultaneously. *See Block v. Rutherford*, 468 U.S. 576, 586 (1984) (noting that "[c]ontact visits . . . open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers."). Thus, the Supreme Court has upheld a prison policy of conducting visual body cavity searches after every contact visit with someone from outside the prison. *See Bell v. Wolfish*, 441 U.S. 520, 559-60, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979); s*ee also Sassi*, 2019 U.S. Dist. LEXIS 15387, at *27, *39-*44 (In the context of a post-classification strip search, a "[c]onfirmatory visual non-contact search" was deemed appropriate, in part, because inmates "may have had potential contact with other inmates.")

"As to the second and third *Turner* factors, although inmates do possess a limited right to bodily privacy, some aspects of that right must yield to searches for contraband, even random visual body-cavity searches, so that prison administrators may maintain security and discipline in their institutions." *Covino*, 967 F.2d at 79. Strip searching inmates who participated in contact visits, while ignoring inmates who, moments earlier were present in the same public space perhaps a few feet apart, only because the latter were positioned in front of a computer screen, would create an obvious facility safety and security concern.

Finally, as to the fourth *Turner* factor, it is not a "'least restrictive alternative' test, rather it requires the inmate to 'point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests.'" *Id.* (citing *Turner,* 482 U.S. at 90-91). In considering this final factor, the Second Circuit noted that courts should "defer to the expertise of the state prison officials, who may anticipate security problems and adopt appropriate solutions for the many problems associated with prison administration." *Covino*, 967 F.2d at 80. And as the Second Circuit expressed just two years ago, "absent 'substantial evidence' of an 'exaggerated' response to penological concerns, the 'security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband.'" *Murphy v. Hughson*, 82 F.4th 177, 185 (2d Cir. 2023) (citing *Florence*, 566 U.S. at 330).

In viewing the strip search policy at Robinson CI as a whole, it becomes clear that Plaintiff's limited right to bodily privacy did not outweigh the facility's significant safety and security concerns in light of the situation where inmates attending video visits occupy the same physical space as inmates conducting contact visits, and the general visiting public.

### b. Plaintiff's Challenge of Searches Conducted by Correction Officers Starzyk and Coggeshall Also Fails as a Matter of Law.

In its initial review, this Court allowed Plaintiff to proceed on his Fourth Amendment claim against Officers Starzyk and Coggeshall in connection with their

specific, individual strip searches. As discussed in the previous section, these searches were performed for a legitimate penological reason. Notwithstanding, even applying the *Bell* factors to the individual searches, it is clear that Plaintiff cannot establish a Fourth Amendment violation.

Pursuant to *Bell*, "each case [ ] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider [1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." *Harris*, 818 F.3d at 58 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

In the present case, as to the first factor, Plaintiff alleges he was subjected to a standard visual cavity search that did not include any contact by the correction officer defendants and his body. *See* (Doc. 1 at 5 – 8) (specifying that the defendant correction officers performed *visual inspections* of the Plaintiff in the challenged strip searches); *see also* (Defs. Local Rule 56(a)(1) St., at ¶¶29 – 33). Further, Plaintiff raises no claim of a cross-gender search. It has further been established that the strip searches at Robinson CI take place within separate partitions within the strip search area adjacent to the visiting room. (Defs. Local Rule 56(a)(1) St., at ¶15). Accordingly, the scope of the particular intrusion here was limited.

As to the second factor, Plaintiff acknowledged that the searches were conducted in a professional manner, and in line with other prior strip searches that he had experienced in the past. (Defs. Local Rule 56(a)(1) St., at ¶¶32 & 33). In other

15

words, the strip searches were practically or mechanically unremarkable, or run-of-the-mill correction officer encounters in the Plaintiff's own view.

As to the third factor, to re-emphasize the justification for the search as outlined in the previous section, the purpose of the search was to prevent the infiltration of contraband into the facility. (Defs. Local Rule 56(a)(1) St., at ¶16).

Finally, as to the fourth factor, as noted above the strip searches in question were conducted in separate partitions in an area designated for the purpose of strip searching, as opposed to in view of other inmates or in an unexpected place.[1] (Defs. Local Rule 56(a)(1) St., at ¶15). Accordingly, the placement of the strip searches should lend further credence to the defendants' argument.

In fact, notwithstanding the fact that Plaintiff himself did not participate in a contact visit, the situation at Robinson CI is otherwise identical to the conduct discussed in *Bell v. Wolfish*, where the Court expressly approved the use of visual cavity searches following contact visits because a "detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." *Bell*, 441 U.S. at 559 99 S. Ct. 1861, 60 L. Ed. 2d 447. Here, too, the record reflects not only the discovery of contraband during post-visit searches, but also hidden contraband within the visiting room itself. *See* (Defs. Local Rule 56(a)(1) St., at ¶¶10 & 20); *Bell*, 441 U.S. at 559 99 S. Ct. 1861, 60 L. Ed. 2d 447.

---

[1] However, the presence of other inmates and employees of a correctional facility does not make an otherwise constitutional strip search unconstitutional. *See Montgomery v. Hall*, 2013 U.S. Dist. LEXIS 103129, at *12 (S.D.N.Y. May 14, 2013) ("[T]he constitutionality of a strip search is not negated by the presence of other inmates and employees of the facility — of either sex — during the search.").

Other courts have held similarly. For instance, in the Court's initial review it cited *Bono v. Saxbe,* 620 F.2d 609, 617 (7th Cir. 1980), in which the Seventh Circuit noted that searches of inmates following non-contact visits could be supported by "a showing that there is some risk that contraband will be smuggled into [the prison] during non-contact, supervised visits, or that some other risk within the prison will be presented." In other words, *Bono* stands for the proposition that strip searches following non-contact visits, like other prison practices aimed at serving legitimate penological interests, can be justified by relevant policy considerations within the expertise of prison administrators. *See id.*; *see also Rhodes v. Chapman,* 452 U.S. 337, 352 (1981) ("In discharging [their] oversight responsibility . . . courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens."); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987) (valid penological objectives include, inter alia, "deterrence of crime," and "institutional security"); *Reynolds v. Quiros,* 25 F.4th 72, 79 (2d Cir. 2022) (valid penological interests include "promoting a non-hostile work environment for DOC staff, [and] enhancing the safety and security of DOC facilities"). And in fact, on remand, in *Bono v. Saxbe,* 527 F. Supp. 1182 (S.D. Ill. 1980), the District Court approved the use of strip searches both *before* and *after* non-contact visits after finding that "the beliefs of prison officials [concerning the likelihood of disruption to

17

prison order or stability] [were] reasonable, and that the strip searches [were] justified as valid security measures." *Id.* at 1186.

## C.    All Defendants Are Entitled to Qualified Immunity.

The defendants are also entitled to qualified immunity. Defendant Quiros had no personal involvement in any of Plaintiff's searches, and his connection to the search policy in question as it relates to the application of rules at Robinson CI regarding the use of the visiting room is too attenuated to establish any liability for him under Second Circuit precedent. As for the remaining defendants, there is no evidence that any of them violated the Constitution, and it is not clearly established that either creating a policy of strip searches following mixed contact and video only visits, or conducting the strip searches themselves was improper.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citations omitted). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *DiStiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012). To overcome qualified immunity, a plaintiff must show that (1) the defendant officials violated a statutory or constitutional right, and that (2) the right was clearly established at the time of the challenged conduct. *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *District of Columbia v. Wesby*,

18

138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "To be clearly established, a legal principle must have a sufficiently clear founding in then-existing precedent [and t]he rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* at 589-90 (citations omitted).

The U.S. Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also City of Escondido*, 139 S. Ct. at 503. For courts to avoid defining rights too broadly, correct analysis requires that "the clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "The dispositive question is 'whether the violative nature of *particular conduct* is clearly established." *Mullenix*, 136 S. Ct. at 308 (emphasis added). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* The qualified immunity analysis must be "particularized" in the sense that "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Doninger v. Niehoff*, 642 F.3d 334, 345-46 (2d Cir. 2011). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Id.* at 345.

"The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Grice v. McVeigh*, 873 F.3d 162,

166 (2d Cir. 2017). "Even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010); *see also Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010). Qualified immunity applies regardless of whether an official's error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact." *Doninger*, 642 F.3d at 353 (internal quotation marks omitted) (citation omitted). So long as a defendant "has an objectively reasonable belief that his actions are lawful," he "is entitled to qualified immunity." *Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013) (internal quotation marks omitted); *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 134-35 (2d Cir. 2013).

Legal research reveals no Second Circuit authority that prohibits strip searches following *mixed* contact and video only visits as occurred at Robinson CI. *Cf. Harris*, 818 F.3d at 61 ("Requiring record evidence to support an officer's justification for a visual body cavity search. . ."). Defendants are entitled to qualified immunity because it cannot be said that every reasonable official would have understood that a policy requiring inmates to be strip searched, in a reasonable manner, would be improper following video visits in a situation where contact with outside visitors is possible. *See Wilson v. Layne*, 526 U.S. 603, 618 (1999) ("If judges . . . disagree on a constitutional question, it is unfair to subject [state employees] to money damages for picking the losing side of the controversy."); *Lennon v. Miller*, 66 F.3d 416, 423 (2d

20

Cir. 1995) (qualified immunity attaches "if officers of reasonable competence could disagree on the legality of the defendant's actions" (internal quotation marks omitted)). To the contrary, given a valid penological justification, even searches after non-contact visits have been allowed by the federal courts. *See, e.g.*, *Bono*, 620 F.2d at 617; *Bono*, 527 F. Supp. at 1186.

### a. Defendant Quiros Had No Personal Involvement and Is Entitled to Qualified Immunity.

The Second Circuit clarified in *Tangreti v. Bachmann* what the Supreme Court had already determined in 2009 in *Aschroft v. Iqbal*: namely, that there can be no supervisory or vicarious liability for actions brought under 42 U.S.C. § 1983. *See Tangreti v. Bachmann*, 983 F.3d 609, 614-20 (2d Cir. 2020); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." (emphasis added))

"[A]fter *Iqbal* . . . . a plaintiff must plead and prove 'that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution.'" *Tangreti*, 983 F.3d at 618 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) (emphasis added). Thus, only direct, personal involvement of the defendant in the constitutional violation is sufficient to establish liability in Section 1983 actions; other theories of personal involvement are not sufficient. *See id.* The *Tangreti* holding is clear and unmistakable: "[t]o hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation

directly against the official without relying on a special test for supervisory liability."

*Id.* at 620.

In the present case, Plaintiff takes issue with a strip search policy at Robinson CI. On its face this allegation is insufficient to establish defendant Quiros's personal involvement in any constitutional violation.

Plaintiff claims in May 2024, he "wrote a letter to defendant Quiros apprising him that defendant Caron has instituted a policy that authorizes prisoners to be strip searched at the conclusion of non - contact, and virtual video visits." (Doc. 1, ¶40). Plaintiff further claims, "Defendant Quiros didn't respond to plaintiff's correspondence." *Id.* Even if Plaintiff could demonstrate that he had sent certain letters to defendant Quiros, those letters are insufficient to demonstrate his personal involvement. Indeed,

> [t]he fact that a prisoner sent a letter or written request to a supervisory official does not establish the requisite personal involvement of the supervisory official. *See Rivera v. Fischer*, 655 F. Supp. 2d 235, [238] (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (quoting *Candelaria v. Higley*, No. 04-CV-277, 2008 U.S. Dist. LEXIS 11976, 2008 WL 478408, at *2 (W.D.N.Y. Feb. 19, 2008) (citing cases). Furthermore, the law is well established, that "a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim." *Swift v. Tweddell*, 582 F.Supp.2d 437, 445-46 (W.D.N.Y. 2008) (citing cases). Thus, a supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (prison official who received letter from inmate and forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right); *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (allegation that defendant did not respond to inmate's letters alleging lack of medical attention was not enough to establish defendant's personal involvement

in alleged violations); *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006) (failure of supervisory prison official to take action in response to letters complaining of unconstitutional conduct is insufficient to demonstrate personal involvement).

*Parks v. Lantz*, No. 3:09-cv-604 (VLB), 2012 U.S. Dist. LEXIS 43221, at *23-*25 (D. Conn. Mar. 28, 2012).

Further, "[a]n inmate's allegation that he lodged informal complaints with supervisory officials and that they subsequently failed to take corrective action falls short of establishing those officials' personal involvement." *Shamel v. Agro*, No. 11 Civ. 9473 (GBD) (HBP), 2013 U.S. Dist. LEXIS 27336, at *33 (S.D.N.Y. Jan. 28, 2013), *report and recommendation adopted*, *Shamel v. Agro*, No. 11 Civ. 9473 (GBD) (HBP), 2013 U.S. Dist. LEXIS 26156 (S.D.N.Y. Feb. 25, 2013). *See also Sealey*, 116 F.3d at 51 (defendant's brief response to two letters did not demonstrate requisite personal involvement for Section 1983 claim); *Reinoso-Delacruz v. Ruggerio*, Docket No. 3:19-cv-149 (SRU), 2019 U.S. Dist. LEXIS 78369, at *8 (D. Conn. May 9, 2019) (allegation that the plaintiff wrote a letter to the defendants and did not receive a response was insufficient to establish personal involvement). Plaintiff's threadbare allegations are simply too far removed from any personal actions of defendant Quiros to demonstrate his personal involvement.

**D.    Plaintiff Failed to Properly Exhaust His Administrative Remedies Before Bringing This Lawsuit.**

The Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a), requires inmates to exhaust administrative remedies before seeking relief in federal court in lawsuits concerning prison conditions. *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

23

Exhaustion in cases covered by § 1997e(a) is mandatory. *See id.* at 524 (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)).

"Section 1997e(a) provides: 'No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see also Correa*, 2018 U.S. Dist. LEXIS 242249, at *8 (quoting 42 U.S.C. §1997e(a)).

The Supreme Court has held that inmates must exhaust administrative remedies before filing any type of action "about prison life," *Porter*, 534 U.S. at 532, regardless of whether or not the inmate may obtain specific relief he or she desires through the administrative process, *see Booth v. Churner*, 532 U.S. 731, 741 (2001). An inmate who fails to file an administrative grievance may not bring the claim in federal court. *Adekoya v. Fed. Bureau of Prisons*, 375 F. App'x 119, 121 (2d Cir. Apr. 29, 2010) (barring inmate federal lawsuit where inmate failed to exhaust administrative remedies).

There can be no dispute in this case that the Plaintiff's lawsuit challenging prison practices and correction officer strip searches is an action "about prison life." *See generally* (Doc. 1); *Porter*, 534 U.S. at 532. Moreover, there is also no dispute that Plaintiff filed this action from prison and that he was therefore a "prisoner confined in any jail, prison, or other correctional facility" for purposes of the PLRA's exhaustion requirement. *See* (Defs. Local Rule 56(a)(1) St., at ¶¶ 1 – 2); *see also* 42 U.S.C. § 1997e(a).

24

Furthermore, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "A plaintiff must *fully* exhaust his administrative remedies." *Sanders*, 2021 U.S. Dist. LEXIS 247916, at *8 (quotation omitted) (emphasis in original). This includes meeting the time limits set forth by the DOC administrative directives. *See, e.g.*, *Baldwin*, 2013 U.S. Dist. LEXIS 22520, at *16 (the exhaustion "requirement includes complying with all procedural requirements, including filing deadlines . . . ."); *Shehan*, 2017 U.S. Dist. LEXIS 1116, at *14 ("If the deadline to file a grievance has passed, an unexhausted claim is barred from federal court.") A plaintiff may not smuggle unexhausted claims into a federal lawsuit otherwise based on claims that he or she did properly exhaust. *See Baldwin*, 2013 U.S. Dist. LEXIS 22520, at *17 (inmate must exhaust his administrative remedies with regard to each claim he asserts in his federal complaint).

An inmate may be excused from the exhaustion requirement only if administrative remedies were *not* in fact available. *See Ross*, 136 S. Ct. at 1859-60. The Supreme Court has identified three circumstances in which an administrative remedy is not available to an inmate: (1) "the administrative remedy may operate as a 'dead end,' such as where the office to which inmates are directed to submit all grievances disclaims the ability to consider them . . . [(2)] the procedures may be so confusing that no ordinary prisoner could be expected to 'discern or navigate' the requirements . . . [a]nd [(3)] prison officials may 'thwart inmates from taking

25

advantage of a grievance process through machination, misrepresentation, or intimidation.'" *Shehan*, 2017 WL 53691, at *6 (quoting *Ross,* 136 S. Ct. at 1859-60).

None of these scenarios are supported by the record in the current action. In addition, the Second Circuit has recognized that A.D. 9.6 is "not so opaque as to be unavailable, plainly stating that [i]f the verbal option does not resolve the issue, the inmate shall submit a written request." *Riles*, 656 F. App'x at 581 (summary order).

Here, the DOC administrative remedies procedures are set forth in Administrative Directive 9.6. (A.D. 9.6, dated April 30, 2021, § 6)(Att. 1 to Ex. A); *Riles*, 656 F. App'x at 579 ("The [DOC] requires inmates to submit grievances in accordance with Administrative Directive 9.6 ('AD 9.6')"). The version of A.D. 9.6 that was in effect at the time of the events relevant to the Plaintiff's complaint required an aggrieved inmate at Robinson CI, for instance, to first seek informal resolution of his issues, in writing, through the use of an Inmate Request Form prior to filing a formal grievance, with a response from an appropriate department head to be made within 15 days. (Defs. Local Rule 56(a)(1) St., at ¶ 24). If the inmate was not satisfied with the informal resolution offered, the inmate was required to file a grievance and attach the Inmate Request Form containing the appropriate staff member's response, among other requirements. (*Id.* at ¶ 25). This filing must be made within 30 days of the cause of the grievance. (*Id.*); *see also Riles*, 656 F. App'x at 579. From there, an inmate could appeal the decision of the Level-1 grievance by filing a Level-2 appeal either (1) within 5 calendar days of the receipt of the decision of the Level 1 Grievance, or (2) within 65 days of the date of the filing of the Level 1 Grievance if the inmate

26

did not receive a timely response to the Level 1 Grievance. *See* (Defs. Local Rule 56(a)(1) St., at ¶ 26). Finally, in some limited circumstances, including within 65 calendar days of the filing of a Level-2 Grievance if no response to that grievance was received within 30 business days, an inmate could file a Level-3 Appeal. (*Id.* at ¶ 27).

### 1. Plaintiff Did Not Properly Exhaust His Administrative Remedies Against Defendant Coggeshall.

As explained above, the DOC provides a means for an inmate to seek administrative review of an issue relating to any aspect of an inmate's confinement that is subject to the Commissioner's authority. Att. 1 to Ex. C, §§ 3(a) & 3(c). As detailed above, Administrative Directive 9.6, entitled Inmate Administrative Remedies, sets forth this procedure. *See* Att. 1 to Ex. C; *see also Riles*, 656 F. App'x at 579; *Allen v. Kunkel*, PRISONER CASE NO. 3:18-cv-297 (JCH)*,* 2018 WL 3553335, at *4 (D. Conn. July 22, 2018). Every inmate receives a copy of this directive in either English or Spanish. Att. 1 to Ex. C, § 5(b). All inmates also receive a written summary of this process during their orientation. *Id.* at § 5(b)(ii). DOC Administrative Remedies Coordinators are appointed to oversee the administrative remedies process. *Id.* at § 4.

Plaintiff alleges in his complaint that he was improperly subjected to strip searches following video only visits at Robinson CI on June 3, 2024 by defendant Starzyk, and on June 10, 2024 by defendant Coggeshall. (Doc. 1, ¶¶29, 36).

Records from Robinson CI reveal that Plaintiff filed a single grievance concerning the June strip searches at issue in this case, which Plaintiff signed on June 24, 2024. (Defs. Local Rule 56(a)(1) St., at ¶41; Att. 3 to Ex. C). This grievance

27

names only defendant Starzyk and the "'Caron' Administration." This grievance is insufficient to put the DOC on notice regarding any claims against defendant Coggeshall. *See, e.g.*, *Sanchez v. Bell*, Docket No. 3:22-CV-1087 (SVN), 2024 U.S. Dist. LEXIS 23064, at *14-*15 (D. Conn. Feb. 9, 2024) (Plaintiff's "failure to mention [defendant] in this grievance precludes it from exhausting any claims against [that defendant] . . . . [because] his grievances must provide notice to the prison officials as to the factual basis of his claims.") (citing *Espinal v. Goord*, 558 F.3d 119, 127-28 (2d Cir. 2009)).

While this grievance identifies certain actions Plaintiff alleges were taken by defendant Starzyk and arguably correctional administrators at Robinson CI generally, this grievance is wholly inadequate to place the DOC on notice of any claims against Coggeshall. Indeed, the DOC should not be burdened in attempting to address the Plaintiff's grievance with the impossible task of deriving the Plaintiff's meaning concerning an entirely different correction officer from a statement that mentions only one such officer, and that does not even fairly allude to other officers with unknown names, for instance. *See Sanchez*, 2024 U.S. Dist. LEXIS 23064, at *14-*15. To ask the agency to somehow ascertain that the Plaintiff meant to include something in his grievance that he did not, or to read the Plaintiff's mind in any regard, is not a reasonable construction of the case law surrounding the PLRA requiring adherence to DOC administrative policies. *See, e.g., id.*; *see also, e.g.*, *Woodford*, 548 U.S. at 90-91. Plaintiff's failure to exhaust his claims as to defendant Coggeshall means those claims must be dismissed.

## III.    CONCLUSION

Based on the foregoing argument, the Court should grant this motion and enter summary judgment in favor of all defendants as to all claims, counts, and causes of action brought against them in this action.

*Respectfully submitted,*

DEFENDANTS

Commissioner Quiros, Warden Caron, Deputy Warden Ogando, Officer Starzyk, and Officer Coggeshall

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/ Dennis V. Mancini*

Dennis V. Mancini (ct30239)
Assistant Attorney General
State of Connecticut
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
dennis.mancini@ct.gov
Tel: (860) 808-5450
Fax: (860) 808-5591

*/s/ Owen R. Eagan*

Owen R. Eagan (ct31804)
Assistant Attorney General
State of Connecticut
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
owen.eagan@ct.gov
Tel: (860) 808-5450
Fax: (860) 808-5591

## CERTIFICATION

I hereby certify that on June 12, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  A copy was also mailed to the following:

**Courtney Green**
**30 Trowel Street**
**Bridgeport, CT 06607**
**greencourtney542@gmail.com**


*/s/ Dennis V. Mancini*

Dennis V. Mancini
Assistant Attorney General