# EXHIBIT A

Courtney Green Deposition Transcript
April 30, 2025
(Excerpts)

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*
                                      \*
COURTNEY GREEN,                       \*
                                      \*
          Plaintiff                   \*
                                      \*
     VS                               \* CIVIL NO.
                                      \* 3:24-CV-1317(VDO)
QUIROS, ET AL,                        \*
                                      \*
          Defendants                  \*
                                      \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

                              April 30, 2025

                              Bridgeport, CT

                              10:54 a.m.




                    - - -
          DEPOSITION OF COURTNEY GREEN
                    - - -








Debra A. Chasse, Court Reporter, CSR #00055

1

Deposition of COURTNEY GREEN, a plaintiff herein, taken on behalf of the defendants herein, for the purpose of discovery and for use as evidence in this cause, pending in the United States District Court, District of Connecticut, pursuant to Notice, before Debra A. Chasse, Licensed Shorthand Reporter, No. 00055, and a Notary Public within and for the State of Connecticut, at the Connecticut State Police Facility, Troop G, 149 Prospect Street, Bridgeport, Connecticut, on the 30th day of April, 2023 at 10:54 a.m., at which time counsel appeared as hereinbefore set forth . . .

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that all technicalities as to the proof of the official character of the authority before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that any objections to the sufficiency of the Notice are waived.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED TO by and among counsel for the respective parties hereto that the reading and signing of the deposition by the deponent is not waived.

the concept of what a record is.  You asked if we're on the record or if we're off it.  So, as you know, we are on the record.  Everything that you say is now being recorded.  Again, I will note that this is the matter of Green versus Quiros 24-CV-1317, and I'll ask if we can take your oath.

Thereupon,

COURTNEY GREEN, residing at 30 Trowel Street, Bridgeport, Connecticut, being first duly sworn, as hereinafter certified, was examined and testified as follows:

DIRECT EXAMINATION BY MR. EAGAN:

Q.    Have you ever been deposed before, sir?

A.    I have.

Q.    When was that?

A.    I want to say maybe 2018.  I think she's a judge now.  Torres.  It was AG Torres.

Q.    Was this a civil case?

A.    It was.

Q.    Do you remember what the name of the case was?

A.    I do.  Green versus Lieutenant Taviner.

Q.    Can you spell that last name for me, please?

A.    T-a-v-i-n-e-r, Gene Taviner.

Q.      Do the public visitors for noncontact visits sit in that large area in the middle to have their noncontact visits with inmates?

A.      No.  They sit at stools on the far end of the wall on the left side, and they use the phone to communicate with the visitor who is on the other side of that plexiglas partition.  They're in the enclosed area of the other side.  That's how they communicate.  So they sit on stools and use the phone; the same jail phone, prison phone, that we would use.

Q.      So those members of the public who where visiting inmates for noncontact visits, are they sitting in that large visiting area that we described in that big L shape somewhere?

A.      They are.

Q.      Are they sitting along one of the walls next to the area where the contact visits take place?

A.      The distance is separate, but they're in the room with the -- yeah, they are in the room.  They don't have contact with anybody the way -- how the visiting room is set up.

Q.      So you're saying that there is a few feet of space between where the contact visits take place and between where the -- withdrawn.  I'm going to rephrase.

You're saying that between the space where

56

we'll say John Q public sits down to have a noncontact visit, there is some space before Jane Q public has her contact visit?

A.    That is correct.

Q.    But they're in the same room; correct?

A.    Correct.

Q.    Okay.  So you mentioned -- can you describe -- withdrawn.

Can you describe, please, the procedure that you go through when you go from a cell -- withdrawn.

Can you please describe the procedure that you go through when you go from your dormitory area to the visiting room area at Robinson?

A.    So you leave the area, your housing unit, you come out, open compound, go through -- you got to get clearance to go through the gate, ring the buzzer, you pass the main control, you keep straight, take a left, and the visiting area is right there.  You pass A and D, which is admitting and discharge area trailer. You arrive in there, as I described, the door right here.  When you come into the inmate side of the visiting area, you put your ID on the fence, the officers come out of the control, they pat you down, whether visit is contact, noncontact, or video visit,

57

drugs.

Q.    Would a weapon be contraband?

A.    Yes.  Money.

Q.    Money is also contraband?

A.    Yes.

Q.    When you're in a visiting room at the DOC, are you allowed to take a note that someone, including your visitor, passes to you?

A.    No.

Q.    Why is that?

A.    It's contraband.  It's deemed contraband. Nothing can be handed from a visitor to a prisoner, in general; candy, notes, money, drugs, knives, weapons.

Q.    You've described that when you arrived to the visiting room with the group of other inmates who were there for a visit, first you're pat searched; is that right?

A.    That's right.

Q.    And then if you're having a video visit, you're directed to a certain laptop; is that right?

A.    That's right.

Q.    And then at that point you have your visit; right, for about an hour?

A.    Yes.

Q.    What happens at the conclusion of those

Q. As a further description, is the strip search area on the other side of the visiting room from the officer's station that we described in the visiting room?

A. It is.

Q. Okay. Is the strip search area adjoining the inmate holding area nearby the visiting room?

A. Yes.

Q. Is the strip search area adjoining both the officer's control bubble and the inmate holding area in this portion of the Robinson facility?

A. Yes.

Q. Can you please describe the strip search area?

A. It's a little small, confined area. The wall faces this way, so when prisoners come in and there's a partition that's maybe 5 feet off the ground, a semi-enclosed bubble, but the cube is like a semi-closed cube but doesn't come out real far and there's about four different partition areas and they'll -- the officers will put a chair in front of each partition and, you know, request that the man -- not request, you know, that you strip one article piece by piece, however they give instructions.

Q. Okay.

advancement that occurred as a response to Covid-19 and it is still with us today?

A.    I'm just speaking from me reading. Looking at some of the acronyms or key terms, virtual visits had already been up there.  I think that the DOC was supposed to implement it.  Covid was the right time. They had been identified as a key term or definition of a virtual visit.

Q.    In any case, video visits did come into place in the prison during the Covid-19 pandemic; is that fair?

A.    That's fair to say, yes.

Q.    So turning to your specific concerns in this complaint, I have on page 5, paragraph 21, you mentioned that on June 3, 2024 you had a video visit with an approved visitor; is that accurate?

A.    That is accurate.

Q.    What do you remember about that day?

A.    I don't remember much about the day.  I remember having the video visit.  I couldn't even tell you with who, but I remember being strip searched at the end.  That's what stood out the most of that visit.  I went from having a great visit day to being stripped and, you know, ruining my day.

Q.    Can you describe what happened at the end,

that it was wrong, based upon the policy.

Q.    Thank you for saying that, but that wasn't my question.

A.    Okay.

Q.    My question was putting your disagreement with the policy aside, and speaking only of the mechanics of that strip search that Officer Starzyk conducted June 3, 2024 by itself, do you think that he behaved inappropriately in that strip search?

A.    In the mechanics, no.

Q.    Did Officer Starzyk wear gloves during this encounter?

A.    Yes, the same gloves that I seen him not change.

Q.    Can you please describe, in general, what the term "strip search" means?

A.    A visual body inspection of a person's unclothed body; including a visual of the ears, mouth, genitalia, under arms, rectum.

Q.    Why are strip searches used?

A.    Strip searches are used, in particular, in this instance after contact visits, in my humble opinion, to stop the infiltration drugs or other contraband; drugs, money, weapons.

Q.    Could you connect those two ideas for me?

defendants Caron and Ogando?

A.    I did.

Q.    You did.  Okay.  Were both defendants, Caron and Ogando, present for the entire discussion that you had on June 7, 2024?

A.    Yes, they both were.

Q.    And can you please describe what that -- how that conversation went?

A.    As I just kind of reiterated with Deputy Warden Ogando the back and forth and how he knows what the directive says, bear with me, we're working on a revision to include such language.  He didn't tell me what it was going to say.  After back and forth, I told him that's not the law, that's not in the directives, strip searching after video visits or noncontact, a few back and forth.  It's not changing.  The policy is not changing.  It's going to continue like that, and that was pretty much the end of that conversation.  Maybe about a 5-minute conversation.  But once he said it is what it is, that was the end of the conversation, for the most part.

Q.    Okay.  In your complaint, page 7, paragraph No. 33, it's noted here that on June 10, 2024 you had another video visit; is that right?

A.    That's correct.

Q.    Can you -- what do you remember about that day?

A.    I don't remember much.  I don't remember who I had a visit with.  I just recall after having a visit, I was strip searched again.  That threw everything off to any time I typically had a visit, it would normally be a great day or afternoon, however, but they strip searched after that video visit.

Q.    What do you remember about what happened when your video visit that day ended?

A.    They called me and instructed me to strip, put my headphones down and submit to a strip search. Again, I'm pretty sure, I know there was some back and forth, my disdain, and after back and forth I complied.

Q.    Is it fair to say that the general procedure was followed by which you ended your video visit and were eventually called into the strip search area; is that correct?

A.    Repeat that question, please?

Q.    Sure.  We'll do a very short timeline, but on this date, June 10, 2024, you had a video visit; correct?

A.    That's correct.

Q.    That video visit ended after approximately an hour; right?

professional manner that day?

A.    Again, I would disagree to that.

Q.    So similar to my questions from the previous incident, it's understood, I will say, that you had a firm disagreement with the policy as it was instituted.  It's understood that your disagreement with that policy causes you to have feelings of disdain for the policy.  Are those accurate statements?

A.    That's very accurate.

Q.    So I will say, putting aside the policy that you disagree with and the disdain that you have for it, mechanically, was the strip search that Officer Coggeshall did conducted professionally?

A.    I'm pretty sure he would think he would. It's objective.

Q.    I will say do you think, in your interaction with Officer Coggeshall, understanding that you disagree with the policy and putting that aside, do you think he behaved in a professional manner during your interaction with him?

A.    Yes, he did.

Q.    As we discussed, you have had strip searches before June 10, 2024; is that correct?

A.    Before June 10th, yes.

Q.    From your experience in those past strip

searches, did Officer Coggeshall conduct his search consistent with the standards that you were familiar with?

A.    Outside of strip searchs that I've been involved in before?

Q.    Yes.

A.    Yes.

Q.    So put another way, did Officer Coggeshall, although you disagree with the policy, conduct the strip search technically in line with what you had experienced before in past strip searches?

A.    He did.  Yes, he did.

Q.    Okay.  And just to be clear that we know what I'm saying, mechanically, I'm asking in terms of the things he asked you to do and how he behaved himself, he behaved consistently with other officers that had strip searched you before?

A.    Yeah, and in that period of time where I had video visits and wasn't searched by some officers.

Q.    But that was a yes?

A.    Yes.

Q.    Going back to your point about the procedure of the strip searches, I want to compare your interaction with Officer Coggeshall to that with Officer Starzyk for a second.

117

A.    Mm-hmm.

Q.    Did Officer Starzyk also do the procedure where he took one sock at a time and gave them back to you, like Officer Coggeshall had done?

A.    No.

Q.    No?

A.    No.

Q.    Okay.  I will also ask, was the procedure that Officer Starzyk used consistent with the one that Officer Coggeshall used in terms of the strip search?

A.    Yes.

MR. EAGAN:  I think this is good time for a 10-minute break.  It's 2:15 p.m.  I will suggest a break at this point.  I have to leave quickly for a call but, otherwise, I'd like to go off the record.

(Whereupon, a recess was taken from 2:15 p.m. until 2:20 p.m.)

MR. EAGAN:  We're back on the record at 2:20.  I wanted to cover the issue that came up at the first stage of this deposition where we were talking about -- I have conferred with my office and I wanted to let Mr. Green know that while it is true that our typical practices do dictate that we take items in cases by mail in this case, the judge had specifically

BY MR. EAGAN:

Q.    Moving back into the substance of this deposition, we covered that you had strip searches that you disagreed with that resulted in this case; is that right?

A.    That's accurate, yes.

Q.    One of those strip searches took place on June 3, 2024; is that right?

A.    Yes.

Q.    The other one took place on June 10, 2024; is that right?

A.    June 10th, yes.

Q.    And, in general, you said that although you disagreed with the policy at place in both, both officers involved comported themselves professionally; is that right?

A.    That's right.  And also, for clarification, the complaint also on March 15th of 2024. It's in -- there was also one March 15th of 2024, too.

Q.    Okay.  Have you ever signed a settlement agreement before?

A.    I have.

Q.    How many times have you signed a settlement agreement before in your lifetime?

A.    That I can think of, off the top of my

Q.      Is it fair to say that what you mean is the policy that you're objecting to was in place at that time?

A.      Correct.

Q.      Okay.  Did you have an orientation upon entering DOC custody?

A.      When you go to Walker, reception for maybe an assessment, yes.  They have orientation in the facility, whatever facility you go to or you have once you're sentenced.  When you go to Walker, they tell you certain things.

Q.      Did that orientation cover grievances?

A.      When they gave you the handbook, they tell you about if you want to file a grievance, it can be found in directive 9.6.

Q.      Are you familiar with the grievance process at DOC?

A.      I am.

Q.      How does one use the process?

A.      Start an informal request or resolution, which normally is verbally or you write an inmate request.  You don't get it resolved via those two ways, then the next step is to write a grievance.  Then from the grievance process, there can be an appeal, based upon what the response is or the resolution given to you

124

A.      That's correct.

Q.      Is there any other portion of this grievance, other than these pages?

A.      As far as clarifying?  That's attached to that?

Q.      My question is this is -- so first we agree that this page, 18 of the initial disclosures is the first page of a grievance that you filed; is that right?

A.      That's correct.

Q.      And this page 19 of the initial disclosures is lined paper.  We're saying that that was an attachment page to that grievance; right?

A.      Yes, that's correct.

Q.      Were there any other attachment pages, aside from this one?

A.      No, there wasn't, because I couldn't appeal because it wasn't subject to further appeal.

Q.      Okay.  I'm going to pass these two pages, page 18 and 19 of the initial disclosure, back to the plaintiff.  Can you please read through those and tell me if you see Officer Coggeshall mentioned anywhere?  Did you see if Officer Coggeshall was mentioned anywhere?

A.      No, he's not mentioned here.  He's

referred to at lease twice.  When I said I was strip searched twice, he was one of the ones I was talking about.

Q.     Can you show me in that document where you think that you referred to him without using his name?

A.     On 6 -- June 12, 2024 I wrote to Captain Martinez explaining to her that twice on second shift, I was strip searched by Officer Starzyk upon conclusion of a virtual video visit and I was asked by Officer Starzyk which section -- that's the first page and that second sentence when I said, according to her, twice on second shift I put I was strip searched.  That was to include Officer Coggeshall in here.  It's not in here, but that was the intention and that's what I meant to put.

Q.     Is there any other mention of that, like that, that uses -- withdrawn.

Is there any -- aside from what you just read, is there any other place in this grievance where Officer Coggeshall is referred to?

A.     No, his name isn't referred to in here no.

Q.     Is there any other place, where even without mentioning his name, Officer Coggeshall is referred to?

A.     No, and I can explain.  One grievance allows you to put one person's name, so once I got the

130

room and using those pieces.

Q.    How would a toothbrush be sharpened?

A.    Constant grinding on a flat surface, maybe the floor, a particular edge of a bunk, the side of a bunk.

Q.    Understanding the Robinson facility as you do, is there any other area where video visits could take place to the same degree that you know in the visiting room?

A.    No.

Q.    Did you generally get along well with corrections officer staff at Robinson?

A.    Yes.  I typically did, yeah.

Q.    Earlier --

A.    Outside of a few who I felt were jerks. There's some jerks that weren't jerks to me.  We got along fine.

Q.    You mentioned earlier that you had at least one incident that caused you to have only noncontact visits; is that right?

A.    That is correct.

Q.    What was that incident?

A.    That was -- I was involved in a fight in the prison in Bridgeport county, maybe 2009.

Q.    Did you have any other disciplinary --

happened at Robinson?

A.    Not with certainty.

Q.    Are you aware of any other types of contraband that have been passed into Robinson?

A.    I don't have direct knowledge of that, but I've seen it during my time in incarceration.

Q.    What types of contraband --

A.    Not necessarily seen it, but I've known of contraband being passed in contact visits during my years of incarceration.

Q.    What type of contraband have you known of during your incarceration?

A.    Namely marijuana and heroin.  Like I said before, whatever they call that deuce, that's what they call it.  The prisoners are hallucinating.

Q.    Are you aware of any inmate drug overdoses taking place in DOC?

A.    I'm not aware of that.  I'm aware of the hallucination that they describe, the deuce.

Q.    Where you aware of any inmate drug deaths that have taken place in the DOC?

A.    No.

Q.    Were you aware of any contraband at Robinson?

A.    Yes.

172

# C E R T I F I C A T E

I, DEBRA A. CHASSE, Court Reporter and Notary Public within and for the State of Connecticut, duly commissioned and qualified, do hereby certify that pursuant to Notice, COURTNEY GREEN, the deponent herein, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this case; that he was thereupon carefully examined upon his oath and his testimony reduced to writing by me; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 16TH day of May, 2025.

_____

Debra A. Chasse, CSR
Notary Public
State of Connecticut

My Commission Expires:
June 30, 2026
CSR No. 00055

178