UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------------------------------------  x
COURTNEY GREEN,                                               :
                                                             :
                                      Plaintiff,             :        ORDER GRANTING
                                                             :        MOTION FOR
                  -against-                                   :        SUMMARY JUDGMENT
                                                             :
COMMISSIONER QUIROS, et al.,                                  :        3:24-CV-01317 (VDO)
                                                             :
                                     Defendants.             :
------------------------------------------------------------  x
```

**VERNON D. OLIVER**, United States District Judge:

Before the Court is Defendants'[1] motion for summary judgment and supporting memorandum (collectively, the "Motion").[2] The Court has reviewed the Motion, the facts contained in Defendants' Local Rule 56(a)1 statement,[3] Defendants' exhibits,[4] Plaintiff's response to the Motion and supporting documents,[5] Plaintiff's Local Rule 56(a)2 statement,[6] Defendants' reply,[7] and the record in this matter. After careful review of the record, the Court concludes that the Motion must be **GRANTED**.

## I.    BACKGROUND

Courtney Green ("Plaintiff"), a *pro se* plaintiff formerly imprisoned at Carl Robinson

---

[1] "Defendants" are Commissioner Quiros, Warden Caron, Deputy Warden Ogando, and Correctional Officers Starzyk and Coggeshall. *See*, Initial Rev. Order, ECF No. 10 at 12.

[2] Def. Mot. Summ. J., ECF No. 40; Mem. Mot. Summ. J., ECF No. 40-1.

[3] R. 56(a)1 Statement, ECF No. 40-2.

[4] Exs. A–C, ECF Nos. 40-3 to 40-5.

[5] Resp., ECF No. 42; Pl. Decl., ECF No. 43; Statement Disp. Facts, ECF No. 46.

[6] R. 56(a)2 Statement, ECF No. 45.

[7] Reply, ECF No. 48.

Correctional Institution ("Robinson CI"),[8] filed a Complaint under 42 U.S.C. § 1983.[9] The Court conducted an initial review of the Complaint under 28 U.S.C. § 1915A(a).[10] There, the Court construed Plaintiff's Complaint as asserting two separate Fourth Amendment claims: (1) a Fourth Amendment challenge to Robinson CI's strip search policy against Commissioner Quiros, Warden Caron, and Deputy Warden Ogando and (2) a Fourth Amendment challenge arising from two strip searches conducted at Robinson CI by Correctional Officers Starzyk and Coggeshall.[11] The Court permitted Plaintiff to pursue these claims against these Defendants in their individual and official capacities.[12] The Court also permitted Plaintiff to pursue a state law claim under Article I, Section 7 of the Connecticut Constitution against Defendants in their individual capacities.[13]

Defendants moved to dismiss the official capacity claims and the state law claims.[14] The Court dismissed those claims on Defendants' motion.[15] Thus, only Plaintiff's Fourth Amendment claims against Defendants in their individual capacities remain.[16]

---

[8] Compl., ECF No. 1 ¶ 3.

[9] *Id.* ¶ 1.

[10] ECF No. 10 at 2.

[11] *Id.* at 7.

[12] *Id.* at 12.

[13] *Id.*

[14] Mot. to Dismiss, ECF No. 22 at 1.

[15] *See* Order, March 7, 2025, ECF No. 27.

[16] *See id.*

Defendants have now moved for summary judgment.[17] They assert three arguments: that (1) Plaintiff's Fourth Amendment claims fail on the merits; (2) Defendants are entitled to qualified immunity; and (3) Plaintiff failed to exhaust administrative remedies as to one defendant.[18] In support of their Motion, Defendants have provided a Local Rule 56(a)1 statement containing material facts.[19] The Court recites below facts from that statement that are relevant to its ruling. In so doing, the Court notes where Plaintiff has disputed facts contained within that statement. The Court also discusses, where necessary, any supplementary evidence, such as the Complaint, Plaintiff's declaration and exhibits submitted with his response to the Motion, and exhibits provided by Defendants.[20]

Plaintiff was imprisoned at Robinson CI from April 28, 2021, to November 19, 2024.[21] Robinson CI is a medium-security prison.[22] Inmates at Robinson CI are permitted to "move about the facility" and "intermingle" with other inmates.[23] Inmates at Robinson CI are also

---

[17] ECF No. 40.

[18] *Id.* at 1.

[19] *See* ECF No. 40-2.

[20] The Court may consider the allegations in a verified complaint or sworn declaration in opposition to a motion for summary judgment. *See Elliott v. Cartagena*, 84 F.4th 481, 486 (2d Cir. 2023) ("A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist…." (cleaned up)); *Lindsay v. Chapdeliane*, No. 3:19-CV-826 (JCH), 2021 WL 752841, at *3 (D. Conn. Feb. 19, 2021) (considering plaintiff's sworn declaration filed in opposition to motion for summary judgment to the extent statements made in it were based on plaintiff's personal knowledge).

[21] ECF No. 40-2 ¶ 2.

[22] *Id.* ¶ 3.

[23] *Id.* ¶ 4.

allowed social visits.[24] These social visits include contact visits, non-contact visits, and video-only visits."[25] Regardless of the type of visit, "[a]ll social visits at Robinson CI are conducted in the same visiting room."[26] This is the only area in Robinson CI "where social visits can be conducted safely and with appropriate protocols."[27]

The visiting room is a "fairly large space with long, cafeteria-like tables, which feature

---

[24] *Id.* ¶ 5.

[25] *Id.*

[26] *Id.* ¶ 6. Plaintiff disputes this point, citing to his deposition testimony. *See* ECF No. 45 ¶ 6 (citing to "Depo. Tr. at p. 56 Lines 1–4"). Plaintiff testified at his deposition that inmates are placed in an "enclosed area" for non-contact visits. Def. Ex. A, ECF No. 40-3 at 5. The inmates "sit at stools on the far end of the wall on the left side, and they use the phone to communicate with the visitor who is on the other side of that plexiglas[s] partition." *Id.* The visitors on the other side of the plexiglass sit in a large visiting area. *See id.* That large visiting area also contains visitors who are conducting contact visits with other inmates. *See id.* Some space in the room separates non-contact visitors from contact visitors, but all visitors are contained in the same room. *See id.* at 5–6. Because Plaintiff testified that inmates conduct non-contact visits in a different area, *id.* at 5, his testimony contradicts the Rule 56(a)1 statement's contention that "[a]ll social visits at Robinson CI are conducted in the same visiting room," ECF No. 40-2 ¶ 6, to the extent that inmates are not in the same room with their visitors during non-contact visits. But Plaintiff's testimony is consistent with other facts alleged in the Rule 56(a)1 statement, *see* ECF No. 40-2 ¶ 12, and is otherwise immaterial because Plaintiff alleges that he was strip searched after a video visit, not a non-contact visit. *See* ECF No. 1 ¶ 11.

[27] ECF No. 40-2 ¶ 8. Plaintiff denies this fact based on "insufficient knowledge to admit." *See* ECF No. 45 ¶ 8. But this fact is deemed admitted because the objection does not point to specific record evidence disputing this fact. *See* D. Conn. L. Civ. R. 56(a)3 ("Failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming admitted certain facts that are supported by the evidence in accordance with Local Rule 56(a)1[.]"); *Devecchis v. Scalora*, 179 F. Supp. 3d 208, 214 n.6 (D. Conn. 2016) (deeming fact admitted under Local Rule 56(a)3 where "[p]laintiffs' denial of th[e] allegation fail[ed] to comply with the specific citation requirement of Local Rule 56(a)3 because it d[id] not cite to specific paragraphs of the cited affidavit."); *Walton v. Connecticut*, No. 3:03-CV-2262 (JBA), 2006 WL 533793, at *2 n.3 (D. Conn. March 2, 2006) (deeming admitted material facts set forth by the defendant where the plaintiff merely claimed insufficient knowledge to respond and offered no evidence to dispute the facts).

a low partition running along the middle."[28] Inmates conducting visits in this room are seated

apart but are not "physically separated from one another."[29] During contact visits, "inmates

meet with visitors while sitting across one of the tables in the visiting room."[30] Inmates are

permitted to "brief[ly] embrace" their visitor at the beginning and end of the visit.[31] During

non-contact visits, "inmates are seated in a secured area adjoining the visiting room behind

glass[.]"[32] The "secure glass wall" contains "small sound holes[.]"[33] Inmates conducting non-

contact visits speak to their visitors by phone while the visitors sit in the visiting room.[34]

During video visits, "inmates meet with their visitors while sitting at laptops placed in the

visiting room."[35] The laptops are placed on wall-mounted desks.[36] The video visits occur

---

[28] ECF No. 40-2 ¶ 9.

[29] *Id.* ¶ 10. Plaintiff denies this fact, citing to paragraph seventeen of his Complaint. *See* ECF No. 45 ¶ 10. But paragraph ten of the Rule 56(a)1 statement describes visitors conducting contact visits, *see* ECF No. 40-2 ¶ 10, while paragraph seventeen of the Complaint describes visitors conducting video visits. *See* ECF No. 1 ¶ 17. To the extent the distance between inmates conducting contact visits and inmates conducting video visits is at issue, the Court addresses that issue below.

[30] ECF No. 40-2 ¶ 11.

[31] Def. Ex. B, Caron Decl., ECF No. 40-4 ¶ 18. Some facts, like this one, are not contained in Defendants' Rule 56(a)1 statement, but the Court considers them as material facts because they are contained in a sworn declaration provided by Defendants. *See Lindsay*, 2021 WL 752841, at *3; *Mejia v. Kurtzenacker*, No. 21-CV-1222 (VDO), 2023 WL 8436074, at *2 n.3 (D. Conn. Dec. 5, 2023) (considering facts submitted by defendants that were not contained in Rule 56(a)1 statement).

[32] ECF No. 40-2 ¶ 12.

[33] *Id.*

[34] *See id.*

[35] *Id.* ¶ 13.

[36] ECF No. 40-4 ¶ 20.

amidst contact visits in the same visiting room.[37]

Social visits "are conducted in groups to avoid strain on staff and resources."[38] Permitting inmates to conduct visits individually would "put undue strain on staff resources and prevent other inmates from accessing necessary court proceedings and similar meetings and would also increase wait times for other inmates seeking social visits, thereby limiting inmate access to those visits."[39] After visits, prison staff remove inmates from the visiting room and take them to an adjoining room.[40] There, prison staff strip search the inmates "in separate partitions" before returning the inmates to their housing units.[41]

The purpose of the strip searches is "to stop the infiltration of contraband into the facility."[42] In the visiting room, "[c]ontraband, including but not limited to illegal drugs, metal objects, or written notes[,] … can be quickly passed or kicked across an open floor and hidden by inmates[.]"[43] In the past, prison officials have recovered "contraband, including various illegal drugs and a metal ring[,]" after strip searching inmates leaving the visiting room.[44]

---

[37] *See id.*

[38] ECF No. 40-2 ¶ 14. Plaintiff denies this allegation, *see* R. 56(a)2 Statement, ECF No. 45 ¶ 14, but the denial is improper, so the fact is admitted. *See supra* note 27.

[39] ECF No. 40-4 ¶ 21.

[40] ECF No. 40-2 ¶ 15.

[41] *Id.*

[42] *Id.* ¶ 16. Plaintiff denies this allegation, *see* ¶ 16, but the denial is improper, so the fact is admitted. *See supra* note 27.

[43] ECF No. 40-4 ¶ 28.

[44] ECF No. 40-2 ¶ 19. Plaintiff denies this allegation, citing Plaintiff's Exhibit 8, paragraph nineteen. *See* ECF No. 45 ¶ 19. Exhibit 8 contains Officer Coggeshall's response to Plaintiff's

6

Prison officials have also recovered contraband that "was apparently hidden for other inmates to retrieve surreptitiously" while conducting "[p]rotective sweeps" of the visiting room.[45] This contraband, "including illegal drugs, metal objects, weapons, or written notes, pose[s] risks to the safety and security of the Robinson CI facility."[46] All inmates from the visiting room must be searched "because they all visit in the same physical space where members of the public are or have been present."[47] Inmates conducting contact and video visits could "obtain

request for interrogatories. *See* Pl. Ex. 8, ECF No. 42-1. Paragraph nineteen of this response states that Officer Coggeshall has not personally "interdicted" drugs from an inmate during a video visit, not that no officer has ever recovered any contraband from any inmate. *See id.* ¶ 19. Plaintiff also maintains in his declaration that "officer(s) have not interdicted drugs from inmate(s) that participated in video visits." ECF No. 43 ¶ 10. But "to create a genuine issue of material fact, Fed. R. Civ. P. 56 requires that supporting affidavits 'be made on personal knowledge [and] shall set forth such facts as would be admissible in evidence....'" *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 283 (D. Conn. 2004) (quoting Fed. R. Civ. P. 56). Plaintiff does not explain how he knows what other officers have and have not discovered during searches. Even if credited, this assertion still does not refute that officers have recovered contraband from inmates leaving the visiting room. Thus, this fact is admitted.

[45] ECF No. 40-2 ¶ 20. Plaintiff denies this allegation, citing Plaintiff's Exhibit 8, paragraph nineteen and Plaintiff's Exhibit 3, paragraph twenty. *See* ECF No. 45 ¶ 20. That Officer Coggeshall has not personally "interdicted" drugs from an inmate during a video visit, *see* Pl. Ex. 8, ECF No. 42-1 ¶ 19, does not refute that other prison officials have recovered contraband at other times. *See supra note* 44. And that prisoners cannot receive contraband from their *visitors* during video visits, *see* Pl. Ex. 3, ECF No. 42-1 at 25–26, does not refute that prison officials have discovered contraband in the visiting room at some point. Thus, this fact is admitted.

[46] ECF No. 40-2 ¶ 21.

[47] *Id.* ¶ 17. Plaintiff denies this allegation, citing Plaintiff's Exhibit 19.. *See* ECF No. 45 ¶ 17. But Plaintiff's Exhibit 19 is merely a copy of DOC Administrative Directive 6.7, Pl. Ex. 19, ECF No. 42-1 at 139–44, which is not "the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." *See* D. Conn. L. Civ. R. 56(a)3. Administrative Directive 6.7 (concerning "Searches Conducted in Correctional Facilities") would not be admissible at trial because it is not relevant under Rule 401 of the Federal Rule of Evidence to show why all inmates must be searched. *See* Fed. R. Evid. 401 (stating that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Thus, this fact is

contraband from outside visitors or from other inmates" if prison staff only searched inmates who had contact visits.[48]

Plaintiff conducted a video visit on June 3, 2024.[49] Plaintiff's video visit was among nine other video visits and thirteen contact visits that day.[50] Plaintiff alleged in his Complaint that, after this video visit, Officer Starzyk led Plaintiff to a "semi-partitioned stall[.]"[51] Officer Starzyk donned latex gloves while Plaintiff raised his arms to submit to a "standard pat search."[52] Officer Starzyk instructed Plaintiff to remove Plaintiff's clothing for a strip search.[53] After Plaintiff argued with Officer Starzyk about the necessity of the strip search,[54] Officer Starzyk once again instructed Plaintiff to remove Plaintiff's clothes "for a visual inspection of

---

admitted.

[48] ECF No. 40-2 ¶ 18. Plaintiff denies this allegation, citing paragraphs fifteen and sixteen of his Complaint. *See* ECF No. 45 ¶ 18. These paragraphs of the Complaint state in relevant part that it is "highly unlikely, and/or improbable" that video visitors would smuggle contraband into the prison, and that "the most likely source of contraband for prisoners is through contact visits and not through non-contact and/or virtual visits." ECF No. 1 ¶¶ 15–16. Similarly, Plaintiff states in his declaration that, based "upon [his] personal knowledge, contact visits are the source of how contraband is introduced into Robinson CI during visits." ECF No. 43 ¶ 9. But even if inmates conducting contact visits are the "most likely" to smuggle contraband into the housing unit, this does not refute that inmates conducting either contact or video visits *could* smuggle contraband into the housing unit. *See infra* discussion at 18. Thus, this fact is admitted.

[49] ECF No. 40-2 ¶ 28.

[50] *Id.* ¶ 26. Plaintiff admits this part and denies this in part. *See* ECF No. 45 ¶ 26. This objection does not point to record evidence, so the fact is admitted. *See supra* note 27.

[51] ECF No. 1 ¶ 24.

[52] *Id.*

[53] *Id.* ¶ 25.

[54] *See id.* ¶¶ 27–28.

his body cavities."[55] Plaintiff "complied with the strip search, got dressed[,] and left without further incident."[56]

Plaintiff conducted another video visit on June 10, 2024.[57] Plaintiff's video visit was among twelve other video visits, five contact visits, and three non-contact visits that day.[58] Plaintiff alleged in his Complaint that, after this video visit, Officer Coggeshall led Plaintiff to the same type of partitioned stall and instructed Plaintiff to remove his clothes.[59] After arguing with Officer Coggeshall about the necessity of the strip search, Plaintiff removed his clothes.[60] Officer Coggeshall instructed Plaintiff "to lift his arms, lift his testicles, turn around, bend, squat, [and] cough while spreading his buttocks."[61] Officer Coggeshall instructed Plaintiff "to turn back around facing him, and to open his mouth wide using his hands that he just lifted his testicles and spread his buttocks with."[62] Plaintiff complied with this instruction after "a few moments of back-and-forth" with Officer Coggeshall.[63] While Officer Coggeshall was searching Plaintiff, other inmates who had just exited their partitions after being searched and

---

[55] *Id.* ¶ 29.

[56] *Id.*

[57] ECF No. 40-2 ¶ 30.

[58] *Id.* ¶ 27. Plaintiff denies this allegation, citing Plaintiff's Exhibit 15. *See* ECF No. 45 ¶ 27. But the inmate request form submitted as Exhibit 15 is not responsive to this allegation. *See* Pl. Ex. 15, ECF No. 42-1 at 126. Thus, this fact is deemed admitted.

[59] *See* ECF No. 1 ¶ 35.

[60] *Id.* ¶¶ 35–36.

[61] *Id.* ¶ 36.

[62] *Id.*

[63] *Id.*

9

nearby correctional officers "were able to see in clear view [P]laintiff's … nude body."[64] After Plaintiff "expressed his dissatisfaction" with Officer Coggeshall strip searching Plaintiff in front of others, Plaintiff "eventually got dressed and exited the offender holding area without further incident."[65]

## II.    LEGAL STANDARD

A motion for summary judgment may be granted only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113 (2d Cir. 2017). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage*, 875 F.3d at 113–14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Which facts are material is determined by the substantive law. *Anderson*, 477 U.S. at 248. "The same standard applies whether summary judgment is granted on the merits or on an affirmative defense…." *Giordano v. Market Am., Inc.*, 599 F.3d 87, 93 (2d Cir. 2010).

The moving party bears the initial burden of informing the Court of the basis for its motion and identifying the admissible evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

---

[64] *Id.* ¶ 37.

[65] *Id.*

Plaintiff cannot "rely on conclusory allegations or unsubstantiated speculation" but "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (cleaned up). To defeat a motion for summary judgment, the nonmoving party must present such evidence as would allow a jury to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

The Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012). However, although the Court is required to interpret a self-represented party's "papers liberally to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (cleaned up), "unsupported allegations do not create a material issue of fact" and do not overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

## III.   DISCUSSION

As described above, Defendants move for summary judgment because (1) Plaintiff's Fourth Amendment claims fail on the merits; (2) Defendants are entitled to qualified immunity; and (3) Plaintiff failed to exhaust administrative remedies as to one Defendant.[66] Because the Court agrees with Defendants that Plaintiff's Fourth Amendment claims fail on the merits, the Court grants summary judgment without considering Defendant's other arguments. *See*

---

[66] ECF No. 40 at 1.

*Linardos v. Juthani*, No. 3:24-CV-962 (VAB), 2025 WL 887693, at \*13 n.4 (D. Conn. Mar. 21, 2025) (declining to address qualified immunity when claims failed on the merits); *Arroyo v. Hartford Bd. of Educ.*, No. 3:17-CV-2067 (MPS), 2019 WL 6350629, at \*15 (D. Conn. Nov. 27, 2019) (declining to address exhaustion when claims failed on the merits).

### A.  Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. While "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell," *Hudson v. Palmer,* 468 U.S. 517, 526 (1984), the Second Circuit has held that "maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy." *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir. 1992). Accordingly, the Fourth Amendment forbids unreasonable strip searches in the prison context. *See Bell v. Wolfish*, 441 U.S. 520, 558 (1979); *Harris v. Miller*, 818 F.3d 49, 58 n.2 (2d Cir. 2016).

When considering whether a strip search violates an inmates right to privacy under the Fourth Amendment, a court "undertake[s] a two-part inquiry: (1) First, the court must determine whether the inmate has exhibited an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights." *Harris*, 818 F.3d at 57 (cleaned up). Deciding the second component of this two-part inquiry requires a court to "apply

12

one of two separate but overlapping frameworks," depending on whether a plaintiff challenges a prison policy or a specific search. *Id.*

For claims challenging "a prison regulation or policy, courts typically analyze the claim under *Turner v. Safley,* 482 U.S. 78 (1987)." *Id.* Under *Turner*, a "regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. The *Turner* court identified four factors "relevant in determining the reasonableness of the regulation at issue." *Id.*

First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). To satisfy this factor, "the governmental objective must be a legitimate and neutral one." *Id.* at 90. And there must be a "logical connection between the regulation and the asserted goal [that] is [not] so remote as to render the policy arbitrary or irrational." *Id.* at 89–90.

Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. If "other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of the regulation." *Id.* (cleaned up).

Third, courts must consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* If an "accommodation of an asserted right will have a significant 'ripple effect'

on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.*

Lastly, courts must consider "the absence of ready alternatives[.]" *Id.* "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

For claims "challeng[ing] an isolated search, courts typically apply the standard set forth in *Bell*[.]"[67] *Harris*, 818 F.3d at 58. *Bell*, like *Turner*, requires a court to consider four factors: "[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." *Bell*, 441 U.S. at 559.

Because Plaintiff challenges both Robinson CI's strip search policy and the strip searches conducted under that policy,[68] the Court considers whether, after reviewing the record as a whole, any reasonable jury could conclude that the policy and strip searches at issue here were unreasonable under *Turner* and *Bell*, respectively. *See Nick's Garage*, 875 F.3d at 113–14.

        i.      **Strip Search Policy**

---

[67] The *Harris* court noted that "*Bell* arose in the context of a pretrial detainee strip-search policy, but its framework is equally applicable to convicted inmates challenging isolated searches." *Harris*, 818 F.3d at 58 n.2.

[68] *See* ECF No. 10 at 7.

14

To determine whether Robinson CI's strip search policy violated Plaintiff's Fourth Amendment rights, the Court must first examine whether Plaintiff has "exhibited an actual, subjective expectation of bodily privacy[.]" *Harris*, 818 F.3d at 57. Plaintiff alleges in his Complaint that prison officials required Plaintiff to "lift his arms, lift his testicles, turn around, bend, squat, [and] cough while spreading his buttocks" during the relevant strip searches.[69] Defendants do not dispute these facts. And because "there is no dispute that a visual body cavity search is a 'serious invasion of privacy[,]'" *Velez-Shade v. Population Mgmt.*, No. 3:18-CV-1784 (JCH), 2019 WL 4674767, at *9 (D. Conn. Sept. 25, 2019) (quoting *Harris*, 818 F.3d at 58), the undisputed evidence adequately satisfies the first component of *Harris*'s two-part inquiry.

Next, the Court must apply the *Turner* factors to determine whether invading Plaintiff's privacy was justified, in satisfaction of the second component of *Harris*'s two-part inquiry. *See Harris*, 818 F.3d at 57. The first *Turner* factor—whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," *Turner*, 482 U.S. at 89 (cleaned up)—is the most important. *See Jones v. Slade*, 23 F.4th 1124, 1135 (9th Cir. 2022) ("The first *Turner* factor is the most important."); *Lewis v. Clark*, 663 F. App'x 697, 701 (10th Cir. 2016) (explaining that "[t]he first *Turner* factor—whether a rational connection exists between the prison regulation and a legitimate

---

[69] ECF No. 1 ¶ 36.

governmental interest—is the most important, as it is not simply a consideration to be weighed but rather an essential requirement." (cleaned up).

"Correctional officials have a legitimate interest, indeed a responsibility, to ensure that jails are not made less secure by reason of what new detainees may carry in on their bodies." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322 (2012). Courts in this Circuit have thus recognized that there is "a valid, rational connection between [a correctional institution's] post-classification strip search policy and the legitimate governmental interest of preventing contraband distribution within the [correctional institution]." *Sassi v. Dutchess Cnty.*, No. 9:16-CV-1450, 2019 WL 401951, at *14 (N.D.N.Y. Jan. 31, 2019). This is so because a newly arriving inmate can conceal contraband on his body and distribute it to other inmates once inside the facility. *See id.*

The same concerns apply when an inmate conducts a contact visit. *See Block*, 468 U.S. at 586 ("Contact visits ... open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers."). Thus, the Supreme Court has upheld a prison policy requiring visual body cavity searches of inmates after every contact visit the inmate has with someone from outside the prison. *See Bell*, 441 U.S. at 559–60.

When considering the identical Robinson CI strip search policy at issue, other courts have concluded that "[i]t does not appear that strip searches after video visits serve any legitimate governmental interest." *Manson v. Caron*, No. 3:24-CV-00876 (MPS), 2024 WL

4188504, at *4 (D. Conn. Sept. 13, 2024). The *Manson* court concluded this because, unlike the contact visits in *Bell*, the visits at Robinson CI were "by video, not in person." *Id.* As such, "[t]he visitor [wa]s not in the facility, let alone in the same room as the inmate," so "there is no way for a video visitor to pass contraband to the inmate and thus no way for the inmate to pass contraband to the general population after the video visit." *Id.*

The *Manson* court, however, reached this conclusion on initial review, when only the plaintiff's complaint was before it. *See id.* at *1; *see also Delgado v. Concepcion*, No. 3:20-CV-787 (SRU), 2020 WL 7388959, at *1–2, n.3 (D. Conn. Dec. 16, 2020) (considering, on initial review of a prisoner civil complaint, the complaint and "documents attached to and incorporated by reference" into it). But here, the parties have completed full discovery, which has revealed facts that compel a different conclusion on summary judgment. *See Finch v. City of Stamford*, No. 3:10-CV-748 (MRK), 2011 WL 5245422, at *1 (D. Conn. Nov. 2, 2011) ("When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record[.]" (citing Fed. R. Civ. P. 56(c)).

Here, as in *Manson*, "there is no way for a video visitor to pass contraband to the inmate" through a video screen. *Manson*, 2024 WL 4188504, at *4. But, in light of the evidence provided by the parties, this is beside the point. Whether a video visitor could pass contraband to an inmate was relevant to the *Manson* court's decision because there was no indication that inmates conducting video visits were in the same room as inmates conducting contact visits. *See id.* After completion of discovery, though, undisputed facts now show that inmates

17

conducting both video and contact visits at Robinson CI share the same visiting room. As such, there *are* ways for outside visitors to pass contraband to inmates conducting video visits other than through a computer.

The parties do not dispute that all social visits are conducted in groups within Robinson CI's visiting room.[70] The visiting room is a "fairly large space with long, cafeteria-like tables[.]"[71] Inmates conducting contact visits at these tables are separated from their visitors by "a low partition running along the middle" of the table.[72] And inmates are allowed to "brief[ly] embrace" their visitor at the beginning and end of the visit.[73] Thus, the proximity of the inmate to his visitor and their two "brief embrace[s]" provide an opportunity for the visitor to transmit contraband to the inmate conducting the contact visit.

The inmates conducting contact visits are seated apart but are not "physically separate from one another."[74] This provides an opportunity for inmates conducting contact visits to pass contraband received from a visitor to another one inmate conducting a contact visit with a different visitor. Thus, any inmate conducting a contact visit may obtain contraband from a visitor, whether that visitor is the inmate's visitor or another inmate's visitor.

---

[70] ECF No. 40-2 ¶¶ 6, 14.

[71] *Id.* ¶ 9.

[72] *Id.*

[73] ECF No. 40-4 ¶ 18.

[74] ECF No. 40-2 ¶ 10.

The inmates conducting video visits are seated in the same visiting room as inmates conducting contact visits with their visitors.[75] Inmates conducting video visits are seated at laptops on wall-mounted desks while contact visits occur in the visiting room.[76] The parties do not precisely describe the distance between the wall-mounted desks and the "cafeteria-like tables" where other inmates conduct video visits.[77] But Plaintiff states in his declaration that "[d]uring video visits, inmates sit in a far corner away and not in the presence of vicinity of those who are having contact visits, so it is very unlikely that contraband would and[/]or could be exchanged."[78] Defendants do not contest this.

The precise distance between the inmates conducting contact visits and the inmates conducting video visits is largely immaterial because both types of visits are conducted in the same room, where "[c]ontraband … can be quickly passed or kicked across an open floor and hidden by inmates[.]"[79] Thus, even if inmates are across the room from one another, inmates conducting video visits may obtain contraband from any inmate conducting a contact visit, regardless of the distance between them. As such, inmates conducting video visits are equally likely to bring contraband back into the housing unit as inmates who conduct contact visits

---

[75] *See id.* ¶ 13; ECF No. 40-4 ¶ 20.

[76] ECF No. 40-4 ¶ 20.

[77] ECF No. 40-2 ¶ 9.

[78] ECF No. 43 ¶ 11; *see also* ECF No. 1 ¶ 17 (alleging that "[v]isitors from outside of the institution do not come in proximity of the area where virtual visits occur nor are they allowed in said area, nor does said visitors come within the province of prisoners participating in virtual video visits[.]").

[79] ECF No. 40-4 ¶ 28.

Contraband "pose[s] risks to the safety and security of the Robinson CI facility."[80] Thus, there is a "valid, rational connection" between a policy designed to prevent that contraband from reaching the housing unit, where it poses a security risk to staff and other inmates. *Turner*, 482 U.S. at 89 (cleaned up); *see also Sadler v. Lantz*, No. 3:07-CV-1316 (CFD), 2011 WL 4561189, at *5 (D. Conn. Sept. 30, 2011) (DOC Administrative Directives "ban[ning] property sent to inmates from outside of prison without consideration of content" had "rational connection to the identified safety and security issues associated with bartering and the inmate receipt of contraband in the form of drugs and potential weapons.").

Further, because inmates conducting both contact and video visits are equally likely to bring that contraband in the housing unit, applying that policy to all inmates conducting visits in the visiting room is neither "arbitrary," nor "irrational." *Turner*, 482 U.S. at 89–90; *see also Reynolds v. Quiros*, 25 F.4th 72, 90 (2d Cir. 2022) ( "[A]ll that is required is that there be a 'rational' connection between the policy and the jail's legitimate objectives." (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999)). Thus, the first *Turner* factor weighs in favor of Defendants.

The second *Turner* factor requires courts to consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90 (cleaned up). "[T]he 'right in question' is the Fourth Amendment right to be free from unreasonable searches."

---

[80] ECF No. 40-2 ¶ 21.

*Manson*, 2024 WL 4188504, at *4. Thus, the Court must consider whether there is some alternative to strip searching inmates after video visits.

One alternative would be to physically separate inmates conducting video visits from inmates conducting contact visits. This could be achieved by either conducting video visits in a separate room or by conducting video visits when contact visits are not occurring. But because of "the number of custody staff at the facility compared to the number of inmates who regularly wish to schedule social visits" and "the layout of the Robinson CI facility, the visiting room is the only area where social visits can be conducted safely and with appropriate protocols."[81] For similar reasons, separating inmates conducting video visits from contact visits would "put undue strain on staff resources and prevent other inmates from accessing necessary court proceedings and similar meetings and would also increase wait times for other inmates seeking social visits, thereby limiting inmate access to those visits."[82]

Another alternative would be to search only the inmates conducting contact visits and to permit inmates conducting video visits to return to the housing unit without officers searching them. But, for reasons described above, inmates conducting both types of visits may equally possess contraband when returning to the housing unit. So, "[i]f only inmates conducting contact visits were strip-searched, this could allow video visit inmates to obtain contraband from outside visitors or from other inmates,"[83] especially if the inmates conducting

---

[81] *See* ECF No. 40-4 ¶ 12; ECF No. 40-2 ¶ 8.

[82] *See* ECF No. 40-4 ¶ 21.

[83] ECF No. 40-2 ¶ 18.

contact visits know that inmates conducting video visits will not be searched. Thus, there are no ready alternatives to strip searching all inmates leaving the visiting room. *See Covino,* 967 F.2d at 79 (concluding that "[t]here do not appear to be any alternative means that would allow [an inmate] to exercise his limited bodily privacy rights and at the same time allow [the prison] to achieve fully the effectiveness of [random visual body-cavity] searches."). Accordingly, the second *Turner* factor weighs in favor of Defendants, too.

The third *Turner* factor requires a court to consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90.  Permitting any inmate to leave the visiting room without being searched would enable inmates to smuggle contraband into the housing unit.[84] Contraband, such as metal objects or weapons, present a danger to both inmates and staff. Similarly, contraband such as illegal drugs increase "the potential for overdoses or other negative reactions" among inmates.[85] Thus, declining to search inmates returning from a video visit would have a "significant 'ripple effect' on fellow inmates or on prison staff[.]" *Id.*; *see also Reynolds*, 25 F.4th at 93 (concluding that permitting inmates to possess and display "sexually explicit pictorial materials" had "ripple effect" on "the work environment of DOC staff and ... the safety and security of staff and inmates alike, as well as the rehabilitation of sex offender inmates."). Accordingly, the third *Turner* factor also weighs in favor of Defendants.

---

[84] *See* ECF No. 40-4 ¶ 25.

[85] *Id.* ¶¶ 28–29.

Finally, courts must consider "the absence of ready alternatives." *Turner*, 482 U.S. at 90. As discussed above, there are no ready alternatives to searching inmates after video visits—at least none that would "fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests[.]" *Id.* at 91. Thus, this factor weighs in favor of Defendants, as well. *See Johnson v. Goord*, 445 F.3d 532, 535 (2d Cir. 2006) (concluding this factor weighed in defendants' favor when plaintiff "ha[d] not suggested any alternatives that would accommodate his rights at minimal cost to the legitimate penological interests of security and order."). Because all four *Turner* factors weigh in favor of Defendants, "prison officials had sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights." *Harris*, 818 F.3d at 57 (cleaned up).

Plaintiff relies on *Manson* and cases cited within it to argue otherwise.[86] The *Manson* court approvingly cited the Seventh Circuit's decision in *Bono*, *see Manson*, 2024 WL

---

[86] *See generally* ECF No. 42 at 4–8 (using language and analysis from *Manson* without attribution and citing *Bono v. Saxbe*, 620 F.2d 609, 617 (7th Cir. 1980)). Plaintiff also argues throughout his pleadings that strip searches after video visits are unconstitutional because the Administrative Directives in place did not provide for them. *See*, *e.g.*, *id.* at 8–9. But as the Court noted in its initial review order, *see* ECF No. 10 at 11, state prison directives do not generally confer any constitutionally protected rights on inmates. *Riddick v. Chevalier*, No. 11-CV-1555 (SRU), 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013); *see Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (noting prison directives, which are designed primarily to guide correctional staff, do not confer rights on inmates). Thus, a search conducted in violation of Administrative Directives "does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983." *Fine v. UConn Med.*, No. 3:18-CV-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019); *see also Mejia v. Kurtzenacker*, No. 3:21-CV-1222 (MPS), 2022 WL 19331, at *10 (D. Conn. Jan. 3, 2022) (dismissing claim alleging that prison officials violated Administrative Directives).

23

4188504, at \*4, in which the *Bono* court held that "the rationale announced in *Bell*"[87] did not justify "strip searches of inmates before and after non-contact visits with family and friends" absent "a showing that there is some risk that contraband will be smuggled into [the prison] during non-contact, supervised visits, or that some other risk within the prison will be presented." *Bono*, 620 F.2d at 617. But the *Bono* court reasoned that the searches there were not justified under *Bell* because "[t]he inmates [we]re separated from the visitors by plexiglass, and guards observe these visits." *See id.* The *Manson* court found *Bono* persuasive because, like the inmates in *Bono*, the inmate in *Manson* had no opportunity to obtain contraband from his visitor and take it back into the housing unit. *See Manson*, 2024 WL 4188504, at \*4. While Plaintiff was also physically separated from his visitors like the plaintiffs in *Bono* and *Manson*, these decisions are nonetheless distinguishable because Plaintiff was conducting his video visits in the same room as inmates conducting contact visits, where he could receive contraband from other inmates or visitors and bring it back into the housing unit irrespective of his ability to obtain contraband from his video visitors. The *Manson* court did not know this uncontested fact,[88] but discovery has revealed it here. Because there is no genuine dispute as to this material fact, summary judgment must enter on Plaintiff's Fourth Amendment claim related to the strip search policy.

### ii. Individual Strip Searches

---

[87] *Turner* was decided seven years after *Bono,* so the *Bono* court analyzed the search under *Bell*. *See Bono*, 620 F.2d at 617.

[88] Both Manson and Plaintiff failed to mention this in their complaints.

The Court next considers whether there is a genuine issue of material fact that would preclude summary judgment on Plaintiff's Fourth Amendment claims challenging the two strip searches in June of 2024. In determining this, the Court considers the four factors in *Bell*. *See Harris*, 818 F.3d at 58.

As to the first *Bell* factor—the "scope of the particular intrusion," *Bell*, 441 U.S. at 559—this "varies with the type of search." *Harris*, 818 F.3d at 58. At least three types of searches implicate an inmate's right to bodily privacy:

> A 'strip search,' though an umbrella term[,] generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A 'visual body cavity search' extends to visual inspection of the anal and genital areas. A 'manual body cavity search' includes some degree of touching or probing of body cavities.

*Id.* (quoting *Cookish v. Powell*, 945, F.2d 441, 444 n.5 (1st Cir. 1991)). "The scope of the intrusion also varies depending on who searches whom, i.e., whether the search involved an officer of the same gender as the inmate." *Id.*

Here, as in *Harris*, Officers Starzyks and Coggeshall performed a "visual body cavity search" because they "visual[ly] inspect[ed] [ ] the anal and genital areas" without "some degree of touching or probing of body cavities."[89] *Id.* And Plaintiff does not identify either

---

[89] *See* ECF No. 1 ¶¶ 29, 36. While true that the second search involved examining the contents of Plaintiff's mouth, *see id.* ¶ 36, Plaintiff "open[ed] his mouth wide using *his* hands." *Id.* (emphasis added). So to the extent a mouth can be considered a "body cavit[y]," Plaintiff does not allege "some degree of touching or probing of body cavities" by an officer. *Harris*, 818 F.3d at 58 (cleaned up).

25

officer as a woman.[90] Thus, the first *Bell* factor weighs in favor of Defendants. *See Hill v. Tyburski*, No. 3:19-CV-01674 (JAM), 2022 WL 4448889, at *4 (D. Conn. Sept. 23, 2022) (granting summary judgment on Fourth Amendment strip search claim where "officers pressed on [inmate's] upper back to lean him forward at the waist while [defendant] visually inspected his rectal cavity for approximately one second" and defendants did not "touch[ ] [inmate's] buttocks or otherwise grope[ ] him in any fashion."); *Carzoglio v. Abrams*, No. 18-CV-04198, 2022 WL 2193376, at *5 (S.D.N.Y. June 17, 2022) (holding that the first *Bell* factor weighed of favor of defendants because officers were of same gender as inmate).

As to the second *Bell* factor—"the manner in which [the search] [wa]s conducted," *Bell*, 441 U.S. at 559—"[a] strip search conducted in a professional manner is more reasonable than one that is not." *Harris*, 818 F.3d at 59–60. The first visual body cavity search can be fairly described as routine. Officer Starzyk used latex gloves and "visual[ly] inspect[ed]" Plaintiff's "body cavities."[91] Courts have "approvingly highlighted [an] officer's use of gloves as a clear sign that the search was conducted in an appropriate manner." *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 81 (D. Conn. 2016) (collecting cases). And Plaintiff does not allege that Officer Starzyk "inappropriately touched" him, *Carzoglio v. Vollmer*, No. 18 CIV. 7780, 2024 WL 4349293, at *9 (S.D.N.Y. Sept. 30, 2024), that the search involved "violence or coercion," *Carzoglio v. Abrams*, No. 18-CV-04198, 2022 WL 2193376, at *5 (S.D.N.Y. June 17, 2022), or that Officer Starzyk made inappropriate comments during the search. *See Jean-Laurent v.*

---

[90] *See* ECF No. 42 at 11 (acknowledging "there was not a cross-gender search[.]").
[91] ECF No. 1 ¶¶ 24, 29.

*Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006) (collecting cases), *aff'd*, 461 F. App'x 18 (2d Cir. 2012) (concluding that the plaintiff sufficiently alleged that the strip search was unreasonable because "the verbal and physical abuse that allegedly accompanied the strip search support[ed] a finding that the search was designed to harass and intimidate.").

The second visual body cavity search proceeded in much the same way as the first, with two exceptions. First, Officer Coggeshall instructed Plaintiff to "to open his mouth wide using his hands that he just lifted his testicles and spread his buttocks with."[92] While it would have been a better practice to require Plaintiff to open his mouth before lifting his testicles or spreading his buttocks, the Complaint does not suggest Officer Coggeshall's command was "designed to intimidate, harass, or punish" Plaintiff. *Id.*

Second, Plaintiff alleges that, during the second search, nearby officers and other inmates could view his nude body during the search.[93] But Plaintiff explains that this was because the partition was ineffective,[94] not because Officer Coggeshall deliberately made Plaintiff disrobe in front of others for the purpose of humiliating him. At any rate, Plaintiff's brief exposure to nearby inmates and officers does not render Officer Coggeshall's actions unprofessional. *See Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralik*, No. 04 CIV. 2199, 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011) ("More recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief

---

[92] *Id.* ¶ 36.

[93] *See id.* ¶ 37.

[94] *See id.*

27

viewing of a naked prisoner by a guard of the opposite sex may be permissible, but that 'regular and close viewing' is prohibited."). Because no facts in the record suggest that Officers Starzyk and Coggeshall conducted the visual body cavity searches unprofessionally, the second factor also weighs in favor of Defendants.

As to the third *Bell* factor—"the justification for initiating [the search]," *Bell*, 441 U.S. at 559—the Court has largely covered this above in discussing the constitutionality of the search policy under which the strip searches in question were conducted. "For courts to be able to assess the reasonableness of an intrusion on an inmate's constitutional rights, Supreme Court precedent suggests that officers must provide a justification that is supported by record evidence." *Harris*, 818 F.3d at 60 (citations omitted). "Circuit courts have similarly required a justification for inmate searches that is supported by record evidence." *Id.* (collecting cases). Here, Defendants have provided such record evidence.

Warden Caron states in her declaration that "[a]ll inmates leaving the visiting room are required to be strip searched because they all visit in the same physical space where members of the public are or have been present and cannot be reasonably separated."[95] That "physical space" is a potential site for exchanging contraband between the visiting public and inmates.[96] Indeed, "contraband has been detected in strip searches of inmates returning from the visiting

---

[95] ECF No. 40-4 ¶ 24.

[96] *See id.* ¶ 27 (indicating that "[s]weeps of the visiting room performed by correctional officers at Robinson CI have [ ] detected various forms of contraband that were apparently hidden for inmates to pick up surreptitiously.").

room at Robinson CI, including various illegal drugs as well as a metal ring."[97] Once that

contraband enters the housing unit, it "pose[s] a safety risk for inmates and staff as well as a

security risk for the Robinson CI facility."[98] The record evidence thus shows a safety and

security justification for strip searching any inmate returning from the visiting room. *See Bell*

*v. Manson*, 590 F.2d 1224, 1227 (2d Cir. 1978) (Lumbard, *J.*, dissenting) (noting it is

"obvious" that the safety of inmates and prison staff "requires some search of prisoners

returning to prison after they have been in contact with others in connection with court

appearances or other outside visits."). Accordingly, the third *Bell* factor weighs in favor of

defendants.

As to the final *Bell* factor—"the place in which [the search] is conducted," *Bell*, 441

U.S. at 559—the Second Circuit has concluded that "a strip search or a body cavity search

conducted in the presence of unnecessary spectators is less reasonable than one conducted in

the presence of only those individuals needed to conduct the search." *Harris*, 818 F.3d at 62.

Here, the strip searches took place in a "semi-partitioned stall" within an "offender holding

area."[99] This offender holding area contains "7 or 8 small partitions" in which other inmates

returning from the visiting room are searched.[100] Plaintiff does not describe any onlookers

observing the first search,[101] but he describes correctional officers and other inmates observing

---

[97] *Id.* ¶ 26.

[98] *Id.* ¶ 28.

[99] *See* ECF No. 1 ¶¶ 24, 35.

[100] *Id.* ¶ 20.

[101] *See id.* ¶¶ 24–29.

29

the second search.[102] Plaintiff explains in his Complaint that others were able to view the second search because "the partitions['] sides do not erect enough to provide side blockage[,] and the[re] is nothing to provide frontal blockage of these partitions[.]"[103]

Some courts have concluded that strip searching an inmate in "a large room with no dividers or partitions … in full view of other inmates, officers, and cameras …. *could* be unreasonable." *Green v. Martin*, 224 F. Supp. 3d 154, 165 (D. Conn. 2016) (emphasis added). But other courts have concluded that "strip searches of prisoners in the presence of other inmates and staff [are] not constitutionally defective, especially in light of legitimate security concerns." *Miller v. Bailey*, No. 05-CV-5493, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008) (collecting cases); *see also Smith v. City of New York*, No. 14 CIV. 5934, 2015 WL 3929621, at *2 (S.D.N.Y. June 17, 2015) (collecting cases) (concluding that "neither the presence of cameras nor the presence of other inmates and employees of a correctional facility makes an otherwise constitutional strip search unconstitutional.").

Unlike in *Green*, the room in which Officers Starzyks and Coggeshall strip searched Plaintiff contained partitions.[104] But, according to Plaintiff, these partitions were ineffective in blocking the view of other inmates and staff in the vicinity.[105] The weight of authority suggests that a momentary exposure of Plaintiff's nude body to staff and other inmates caused by the

---

[102] *See id.* ¶ 37.

[103] *Id.*

[104] *See id.* ¶¶ 20, 24.

[105] *See id.* ¶ 37.

ineffective partitions is insufficient to render the strip searches unconstitutional. *See Miller*, 2008 WL 1787692, at *9 (collecting cases); *Smith*, 2015 WL 3929621, at *2 (collecting cases). As such, in a case in which an inmate "allege[d] that the partitions used during the [visual cavity] searches were insufficient and his bare feet were exposed to the floor of the housing unit," the court concluded that the inmate's claims challenging the strip search failed as a matter of law. *Esquilin v. Schriro*, No. 13-CV-3724, 2014 WL 2795408, at *4 (S.D.N.Y. June 19, 2014) (footnote omitted). Accordingly, the final *Bell* factor also weighs in favor of Defendants.

Because all four *Bell* factors weigh in favor of Defendants, the Court cannot conclude that there is a genuine issue of material fact that would preclude summary judgment on Plaintiff's Fourth Amendment claims challenging the two strip searches in June of 2024. Accordingly, summary judgment must also enter on this claim.

## IV.    CONCLUSION

Because there is no genuine issue of material fact that would preclude summary judgment on Plaintiff's Fourth Amendment claims, the Court **GRANTS** the Defendants' motion for summary judgment, ECF No. 40. The Clerk is directed to enter judgment and close this case.

**SO ORDERED.**

Hartford, Connecticut
March 4, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge

31